# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS JUDGE FILIP
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| PREMIUM PLUS PARTNERS, L.P., individually and on behalf of all others similarly situated, | ) ) ) | **MAGISTRATE JUDGE DENLOW** |
| Plaintiff, | ) ) | **04C 1851** |
| v. | ) ) ) | No. |
| PETER J. DAVIS, JR., JOHN M. YOUNGDAHL, GOLDMAN SACHS & COMPANY, INC., STEVEN E. NOTHERN, MASSACHUSETTS FINANCIAL SERVICES COMPANY, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Premium Plus Partners, L.P. ("Plaintiff"), by and through its attorneys, brings this class action and complains of Defendants, Peter J. Davis, Jr.,("Davis"), John M. Youngdahl ("Youngdahl"), Goldman Sachs & Co., Inc.("Goldman Sachs"), Steven E. Nothern ("Nothern"), and Massachusetts Financial Services Company ("MFS") (collectively "Defendants"). Plaintiff alleges the following on information and belief, except those allegations concerning Plaintiff which are alleged upon personal knowledge. Plaintiff's information and belief is based on investigation by counsel and documents filed and published by the Securities and Exchange Commission.

## INTRODUCTION

1.     This is a class action to recover monetary damages from Defendants resulting from their manipulation of the markets for 30-Year Treasury Bonds, 30-Year Treasury Bond Futures, and 30-Year Treasury Bond Options. Plaintiff represents the following class:

All individuals and entities who held short positions in 30-Year Treasury Futures or 30-Year Treasury Options as of 9:25 a.m. (EST) on October 31, 2001 and who covered such short positions at any time thereafter.

Excluded from the Class are the Defendants, members of the individual Defendants' families, any entity in which any Defendant has a controlling interest or is a parent or subsidiary of or is controlled by any Defendant, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of any Defendant.

2. Defendants' manipulation of the markets for 30-Year Treasury Bonds, 30-Year Treasury Bond Futures, and 30-Year Treasury Bond Options took place in 2001. However, the truth surrounding their misconduct did not emerge until September 4, 2003, when the Securities and Exchange Commission publicly disclosed the results of its investigation against Defendants.

3. Goldman Sachs and MFS paid Davis to provide material nonpublic information procured at confidential United States Department of Treasury ("the Treasury Department") quarterly refunding meetings, including a conference that took place between 9:00 a.m. and 9:25 a.m. on October 31, 2001. (All times alleged in this Complaint reflect Eastern Standard Time.) During that confidential meeting, Davis learned that the Treasury Department would suspend the 30-Year Treasury Bond. Public disclosure of this information would drive-up demand for and increase the price of the 30-Year Treasury Bond and increase the cost at which investors would have to cover short positions in 30-Year Treasury Futures and 30-Year Treasury Bond Options. Meeting attendants were obligated to hold this information in strict confidence until 10:00 a.m., when the Treasury Department intended to publicly disclose the information. Otherwise, those who attended the confidential meeting would have an unfair advantage if they were to trade on this information. Defendants ignored the duty to hold in strict confidence the Treasury Department's decision.

4.    Davis violated his duty to maintain the strict confidence of the Treasury Department's decision. Rather than maintaining the confidentiality of the information during the embargo period, Davis, immediately upon receiving this information shortly after 9:25 a.m. on October 31, 2001, called Youngdahl (Goldman Sachs) and Nothern (MFS) on his cell phone and provided them with material nonpublic information, *i.e.*, that the Treasury Department had decided to suspend the 30-Year Treasury Bond. Immediately upon receiving the tip from Davis and before public disclosure of the Treasury Department's decision, Youngdahl tipped traders on Goldman Sachs' Treasury Desk who, in turn, purchased $84 million in 30-Year Treasury Bonds and significant amounts of 30-Year Treasury Futures. Similarly, immediately upon receiving the tip from Davis and before public disclosure, Nothern and other MFS traders immediately purchased $65 million in 30-Year Treasury Bonds before public disclosure. The trades by individuals at Goldman Sachs and MFS were part of a larger scheme by these individuals and entities to manipulate the markets for 30-Year Treasury Bonds, Futures and Options.

5.    Defendants' improper transactions, which occurred between the Treasury Department's confidential meeting and the time the trading public would receive the information, reduced the supply and drove up the price of the 30-Year Treasury Bond and drove up the cost of covering short positions in 30-Year Treasury Futures and Options. The market for 30-Year Treasury Bonds, 30-Year Treasury Futures, and 30-Year Treasury Options move in lock-step. Accordingly, an increase in the price of 30-Year Treasury Bonds causes a corresponding increase in the price of 30-Year Treasury Futures and the cost to cover short positions in 30-Year Treasury Options. As a result of the improper trading by Goldman Sachs and MFS traders, when the Treasury Department's decision was publicly disclosed, individuals and entities that held "short" positions in 30-Year Treasury Futures and Options were forced to

cover their positions at prices far greater than would have existed in the absence of Defendants' improper trades.

6.     Plaintiff sets forth the following claims on behalf of themselves and the Class: Commodity Exchange Act claim against Goldman Sachs and Youngdahl (Count I); Commodity Exchange Act Claim against MFS and Nothern (Count II); Commodity Exchange Act claim against Davis (Count III); Illinois Consumer Fraud and Deceptive Business Practices Act claim against all Defendants (Count IV); civil conspiracy against Goldman Sachs, Youngdahl and Davis (Count V); civil conspiracy against MFS, Nothern and Davis (Count VI); Sherman Antitrust Act claim against Goldman Sachs, Youngdahl and Davis (Count VII); Sherman Antitrust Section I claim against MFS, Nothern and Davis (Count VIII).

## JURISDICTION AND VENUE

7.     The jurisdiction of this Court is based on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims). The federal claims alleged herein arise under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

8.     Venue is proper in this district, pursuant to U.S.C. § 1391(b), because substantial events giving rise to Plaintiff's claims occurred in this district.

9.     In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States Mails, interstate telephone communications and the facilities of national securities and commodities exchanges and markets.

## PLAINTIFF

10.     Premium Plus Partners, LP is an Illinois limited partnership. Premium Plus Partners held substantial short positions in 30-Year Treasury Options as of 9:25 a.m. on October 31, 2001, and suffered substantial losses as a result of Defendants' improper conduct when it was forced to cover those short positions.

## DEFENDANTS

11.     Goldman Sachs & Company, Inc. is a New York corporation. Its Global Economics Group is based in New York. Youngdahl was at all relevant times Vice President and Senior Economist of the Goldman Sachs' Global Economics Group.

12.     Massachusetts Financial Services Company is a Boston, Massachusetts investment company. It is a unit of Sun Life Financial Services of Canada, Inc., one of the largest mutual fund companies, with $130 billion under management.

13.     Peter J. Davis, Jr., is a resident of Washington, D.C. Through his sole proprietorship in Washington, D.C., Davis Capital Investment Ideas, Davis sells his oral and written analyses of Washington political and financial events to broker-dealers, financial analysts and investors. Davis is an economist and was a Congressional aide for approximately 11 years. Goldman Sachs and MFS were, at all relevant times, clients of Davis

14.     John M. Youngdahl, a resident of Summit, New Jersey, was at all relevant times a Vice President and Senior Economist in Goldman Sachs' Global Economics Group, based in New York City. At all relevant times, Youngdahl sat on the Goldman Sachs Treasury Desk in New York, where he advised traders on that desk with respect to economic and political developments that affected their daily trading activity.

15.     Steven E. Nothern, a resident of Scituate, Massachusetts, was at all relevant times a Senior Vice President at MFS, a Boston, Massachusetts-based investment management company adviser. Nothern's duties included management of seven fixed income mutual funds with a combined net asset value of approximately $4 billion at all relevant times, including a fund that invested in Treasury issues and other high-grade, fixed income securities.

## FACTUAL ALLEGATIONS

### THE 30-YEAR TREASURY BOND, FUTURE, AND OPTION

16.     The Treasury Department is an Executive Department of the United States Government.   It issues and sells debt obligations of the Federal Government to finance government operations.   Among the debt obligations Treasury has historically issued are bonds that mature at a term of 30 years ("the 30-Year Treasury Bond").

17.     The 30-Year Treasury Bond, or "long" bond, was the longest-term bond issued by the Treasury Department.  Historically, it has served as an important benchmark for other United States government bonds and, directly or indirectly, for the bond market generally.  The 30-Year Treasury Bond played a critical role in trading for a wide variety of other financial instruments and is the financial instrument underlying the 30-Year Treasury Future and the 30-Year Treasury Option.  The vast majority of the trading volume of 30-Year Treasury Bonds occurs in the over-the-counter market.  Public announcement that the Treasury Department will suspend issuance of the 30-Year Treasury Bond will drive up the price of outstanding bonds with that maturity because traders anticipate a shortage.   Traders with advance knowledge that the Treasury Department will suspend a bond can realize enormous profit by purchasing the bonds before the announcement and selling immediately afterwards.

18.     The 30-Year United States Treasury Bond Future ("the 30-Year Treasury Future")
is traded on the Chicago Board of Trade ("CBOT").    The financial instrument or commodity
underlying the 30-Year Treasury Future is the 30-Year Treasury Bond Future.    A seller of a 30-
Year Treasury Future assumes a "short" position and agrees to deliver $100,000.00 in 30-Year
Treasury Bonds for an agreed price at an agreed date.    A buyer of a 30-Year Treasury Future
assumes a "long" position and agrees to take delivery of $100,000.00 in 30-Year Treasury Bonds
for an agreed price in a specified contract month.    Public announcement that the Treasury
Department will suspend issuance of the 30-Year Treasury Bond, which increases the price of
the bond, disfavors the seller of a 30-Year Treasury Future, who must procure 30-Year Treasury
Bonds at a greater cost.    On the other hand, such news benefits the buyer of a 30-Year Treasury
Future, who can realize the difference between the agreed-upon price set forth in the futures
contract and the price at which the 30-Year Treasury Bond is currently trading.

19.     Options on 30-Year U.S. Treasury Bonds ("30-Year Treasury Options") are also
traded on the CBOT.    The financial instruments or commodities underlying 30-Year Treasury
Options are the 30-Year Treasury Bond and the 30-Year Treasury Future.    30-Year Treasury
Options come in two forms, the "put option" and the "call option."

20.     With respect to "put options," the buyer of a 30-Year Treasury *Put* Option
purchases the right to assume a "short" position in one 30-Year Treasury Bond Futures contract
of a specified contract month at a "striking price" set at the time the option was purchased prior
to the expiration of the option.    The seller of a 30-Year Treasury *Put* Option agrees to assume a
"long" position in a 30-Year Treasury Futures contract of a specified contract month at a striking
price set at the time the option was sold, upon exercise by a put option buyer.

21.    With respect to "call options," the buyer of a 30-Year Treasury *Call* Option purchases the right to assume a "long" position in one 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was purchased prior to the expiration of the option. The seller of a 30-Year Treasury *Call* Option agrees to assume a "short" position in a 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was sold, upon exercise by the call option buyer.

## THE TREASURY DEPARTMENT'S CONFIDENTIAL PRESS CONFERENCES.

22.    The Treasury Department disclosed key news concerning the federal government's financing requirements at quarterly refunding conferences, which took place at the end of each quarter, including the quarter ending October 31, 2001. These announcements sometimes included details about the Treasury Department's plans to issue, suspend or buy back its bonds in the coming quarter. All attendees of these conferences were obligated to maintain the strict confidentiality of (and not to disclose to others) any information disclosed in the conferences during an "embargo" period announced during the conferences. The Treasury Department imposed this strict obligation ensure the accurate, uniform and orderly dissemination of refunding information and to preserve the integrity of the market for its debt issues by making certain that all market participants were afforded equal access to the same information at the same time.

23.    Only individuals with press credentials or a visitor's pass were entitled access to the Treasury Department's property. Visitor's passes were granted only with the approval of a Treasury Department official for a visit at a particular time and for a specific purpose. The Treasury Department granted visitor's passes to non-credentialed members of the press for attendance at a specific event. All visitors were required to provide his or her name and date of

birth or social security number for a background check by the Secret Service before the visitor's pass was issued.

24.  At all relevant times, all persons on the Treasury Department's property were required by law to abide by the Treasury Department's regulations, and to comply with the Treasury Department's regulations, including those relating to information embargoes. 31 C.F.R. § 407.5. Violations are punishable by fine or imprisonment, or both. 31 C.F.R. § 407.14. At all relevant times, a federal criminal statute, 18 U.S.C. § 641, prohibited any person from converting to his or her own use or conveying without authority anything of value belonging to the United States (or any department thereof), upon penalty of fine or imprisonment for up to ten years or both.

### DAVIS ATTENDED TREASURY REFUNDING PRESS CONFERENCES.

25.  Davis had been attending the Treasury Department's quarterly refunding press conferences since 1994 and had an explicit agreement with the Treasury Department that he could attend the refunding press conferences only if he obeyed embargos on information disclosed therein. Davis understood that the embargo was a long-standing practice that required recipients of non-public Treasury Department information to keep the information confidential until it is made public.

26.  Treasury first permitted Davis to attend refunding press conferences in 1994 pursuant to in explicit face-to-face agreement Davis made with a senior adviser in the Treasury Department's Office of Federal Finance. Davis agreed to preserve the confidentiality of any embargoed information he learned by attending any refunding press conference. It was only by reason of this agreement that the Treasury Department permitted Davis to attend refunding press conferences from approximately 1994 to 2001.

30. During the relevant period, Davis communicated with his clients by near-daily e-mails, facsimile, and telephone calls that both Davis and his clients initiated. Each Monday morning, Davis e-mailed his clients a weekly calendar of Washington events.

## DAVIS' RELATIONSHIP WITH GOLDMAN SACHS.

31. Youngdahl (Goldman Sachs) first met Davis in mid-February 2001. At that meeting, Davis explained to Youngdahl, among other things, that he knew people at the Treasury Department. Davis also gave Youngdahl a sales brochure. Davis told Youngdahl that he had good contacts and could provide information about developments in Congress and in the administration. Subsequently, in May 2001, Davis e-mailed the promotional brochure for Davis Capital Investment Ideas to Youngdahl, who then forwarded it to others at Goldman Sachs.

32. Goldman Sachs retained Davis in reliance on Youngdahl's recommendation. Upon information and belief, Goldman Sachs provided Davis with substantial compensation for his services. Thereafter, from Spring 2001 through at least October 2001, Youngdahl was Davis' primary contact at Goldman Sachs. He received daily e-mails from Davis, periodically sent e-mails to Davis, and spoke to Davis by phone approximately once a week. Davis knew that Youngdahl sat on a Goldman Sachs' Treasury desk.

33. At this time, Goldman Sachs' former managing director (the "Treasury Desk Managing Director") who supervised, among others, the Treasury Desk, sat on the Treasury Department's Treasury Borrowing Advisory Committee ("TBAC"), which meets in Washington, D.C., in conjunction with Treasury Department refunding announcements, and advises the Treasury Department on debt finance issues. Members of the TBAC may not discuss the contents, debates, or recommendations of TBAC meetings with anyone other than other TBAC

members or Treasury Department officers or employees until after the Treasury Department publicly releases the refunding information.

34.   On May 2, 2001, after gaining admittance to the Treasury Department's refunding conference, Davis placed a phone call to and reached Youngdahl minutes before the public release of confidential Treasury Department information disclosed at the refunding conference. In that conversation, Davis communicated to Youngdahl the size of the auctions that the Treasury Department had disclosed it would offer to the market.  This information was the precise information released to the public in official Treasury Department announcements later that day. Youngdahl relayed the confidential information he received from Davis to a senior manager on Goldman Sachs' Treasury Desk.

35.   Similarly, in July 2001, Davis and Youngdahl agreed, in a series of e-mails, that Davis would violate Treasury Department embargos by providing Youngdahl with confidential information he learned at Treasury refunding press conferences.  On August 1, 2001, Davis again gained admittance to the Treasury Department's refunding press conference.  This time, pursuant to Davis' explicit July 2001 agreement to provide to Youngdahl with confidential information he learned at the Treasury Department's quarterly refunding conferences before expiration of the embargo, and in conformity with their prior practice, Davis again placed a phone call to and reached Youngdahl minutes before public release of confidential Treasury information.  In that conversation, Davis again told Youngdahl the size of the auctions that Treasury had disclosed it would offer to the market. This information was, again, the precise information later released to the public in an official Treasury announcement. Youngdahl again relayed the confidential information he received from Davis to a senior manager on Goldman Sachs' Treasury Desk. Youngdahl knew that Treasury refunding announcements were subject to an embargo and that

the Treasury Department intended that the information disclosed in the refunding press conferences remain nonpublic and confidential until Treasury publicly released the information.

## DAVIS' RELATIONSHIP WITH MFS.

36.     Nothern has known Davis since the mid-1990s. MFS first retained Davis sometime between 1995 and 1997. MFS paid Davis $12,000 per year for his services. Nothern was Davis' primary contact at MFS. Nothern met with Davis at least twice in Washington, D.C. In January 1999 and again in January or February 2000, Nothern attended a day of meetings that Davis arranged between several of his clients and federal government officials, including officials from Treasury.

37.     During the relevant time period, Davis sent Nothern e-mails approximately three times a week and periodic facsimiles including copies of the Treasury Department's refunding announcement press releases.

## DAVIS ATTENDED THE OCTOBER 31, 2001
## TREASURY DEPARTMENT PRESS CONFERENCE.

38.     On October 30, 2001, Treasury Public Affairs issued a press release stating that a refunding conference would take place the next day, and that the announcement would be embargoed until 10:00 a.m. on October 31, 2001. On October 31, 2001, the Treasury refunding conference was conducted behind closed doors at the Treasury building. Access was limited to government officials and those persons with press credentials or visitors' passes, and controlled by the Secret Service and the Treasury Department's Office of Public Affairs.

39.     On October 31, 2001, Davis obtained a visitor's pass in the manner described above, and was granted entry to the Treasury Department building consistent with his usual practice. Had Davis at any time or in any manner disclosed that he did not intend to or would not obey the Treasury Department's embargos on information disclosed at the refunding press

conferences he was permitted to attend, he would have been denied entry to the Treasury Department building and denied admission to its refunding press conferences.

40.    On October 31, 2001, at 9:00 a.m., the refunding press conference began in the "Diplomat" conference room on the third floor of the Treasury building. Davis was in attendance, along with approximately 30 to 50 other persons. Davis attended the nonpublic quarterly refunding press conference from 9:00 a.m. to approximately 9:25 a.m.

41.    The spokesperson for the Treasury Department's Office of Public Affairs, from the podium, instructed all attendees to turn off cell phones and pagers, and directed that the doors be closed. She announced that an embargo was in effect immediately and that it would remain in effect until 10:00 a.m. She then introduced the speaker, Undersecretary of the Treasury Peter Fisher, and advised that Fisher would take questions after his statement until 9:40 a.m., and again stated that the embargo would expire at 10:00 a.m.

42.    At the conference, the Treasury Department informed attendees that it would announce its intention to suspend issuance of the 30-Year Treasury Bond later that morning and that news of the announcement was embargoed until 10:00 a.m. Thus, the Treasury Department required all individuals present to maintain confidentiality of the information until expiration of the embargo.

43.    A hard copy of the press release was then distributed to the attendees. Fisher read a prepared statement containing the substance of the press release, including the information that Treasury would suspend issuance of the 30-Year Treasury Bond. Fisher then took questions from the press. Following the Q&A session, the Treasury spokesperson again and, for the third time, cautioned attendees to observe the embargo until its expiration at 10:00 a.m.

44. Davis, despite these warnings, and in violation of his explicit prior agreement with a Treasury official to abide by the embargo, failed to observe the embargo. Between the time he left the October 31, 2001 refunding press conference and 9:43 a.m., Davis made at least nine cellular phone calls to eight of his clients, including Youndahl (Goldman Sachs) and Nothern (MFS). Davis placed those calls at 9:28 a.m., 9:32 a.m., 9:33 a.m., 9:34 a.m., 9:35 a.m., 9:37 a.m., 9:38 a.m., 9:39 a.m., and 9:41 a.m.

### DAVIS TIPPED GOLDMAN SACHS, AND GOLDMAN SACHS TRADED.

45. At 9:35 a.m., Davis placed a cellular phone call to Youngdahl at the Goldman Sachs' Treasury Desk. Davis informed Youngdahl that the Treasury Department would suspend sales of the 30-Year Treasury Bond and 30-Year TIPS (Treasury Inflation Protected Securities), and would change its buyback program currently in effect. Because Davis knew that Youngdahl sat on a Goldman Sachs trading desk, Davis knew, recklessly disregarded, or should have known that Youngdahl would tip others to trade in the 30-Year Treasury Bond market and related markets.

46. Youngdahl immediately interrupted his conversation with Davis, placed Davis' call on hold, turned to a Senior Trader, who was seated nearby, and instructed him, "I wouldn't be short bonds if I were you." At least one other trader on Goldman Sachs' Treasury Desk heard this statement. A trader is "short" a security when he or she has no inventory but has sold that security in the expectation that the price will fall and he or she will be able to profit by purchasing the security he owes at the lower price. In effect, Youngdahl told the Senior Trader that the price of bonds would rise and that they should cover their short positions and assume long positions.

47. After conveying his advice to the Senior Trader based on Davis' tip, Youngdahl returned to his telephone conversation with Davis and requested that Davis repeat the information he had just conveyed to Youngdahl. Immediately after Youngdahl concluded his telephone conversation with Davis, Youngdahl informed the Senior Trader that it was Davis who had just called Youngdahl. Youngdahl communicated to the Senior Trader and at least one other Goldman Sachs' Treasury Desk trader the content of the tip he had received from Davis. Youngdahl also told the Senior Trader that Davis' tip led him to believe that Youngdahl's prior forecast that Treasury would continue to issue the 30-Year Treasury Bond was wrong.

48. After 9:35 a.m. on October 31, 2001, when Davis called Youngdahl, and before 9:43 a.m., when news that Treasury has suspended issuance of the 30-Year Treasury Bond was inadvertently posted on Treasury's web site (explained below), Goldman Sachs' Treasury Desk purchased $84 million in par value of 30-Year Treasury Bonds. The Goldman Sachs Treasury Desk traders, including Jason Evans, made these purchases after Youngdahl tipped them with the Davis information. In addition, according to a September 4, 2003 article in the Wall Street Journal, Goldman Sachs traders immediately began purchasing 30-Year Treasury Bond Futures as a result of the tip from Davis.

49. The Goldman Sachs Treasury Desk traders had conspired to trade on material non-public information in advance of Davis' phone call. According to a November 14, 2003 article in the Wall Street Journal, Mr. Youngdahl stated "'a Goldman trader, who knew of my relationship with the consultant [Davis], asked whether I had heard from the consultant.'" Mr. Youngdahl informed the Goldman trader, "'I ha[v]e heard from the consultant'" and "'repeated the news about the elimination of the 30-year bond.'"

50.     Goldman Sachs' Treasury Desk traders sold $84 million par value bonds after 9:59 a.m. on October 31, 2001. Goldman Sachs realized profits of at least $4.3 million dollars.

### DAVIS TIPPED MFS, AND MFS TRADED.

51.     At approximately 9:38 a.m. on October 31, 2001, Davis phoned Nothern and left Nothern a voicemail message that Peter Fisher had informed Davis that Treasury would cancel the 30-Year Treasury Bond, that Treasury would release a press announcement of the cancellation at 10:00 a.m., and that the news was under embargo until that time. Davis knew, recklessly disregarded, or should have known that Nothern would trade on the material nonpublic information Davis conveyed to Nothern or that Northern would tip others to trade 30-Year Treasury Bonds.

52.     Almost immediately, Nothern retrieved and listened to the voice mail message. Nothern knew that Peter Fisher was an official at the Treasury Department in the debt finance area who had access to information of this nature, that the Treasury Department refunding announcements conveyed market sensitive information, and the existence and nature of the Treasury Department's information embargos.

53.     Immediately upon hearing Davis' message, Nothern told three other MFS portfolio managers that he had just received a voice mail message from Davis, a Washington, D.C. consultant, that the Treasury Department would cancel the 30-Year Treasury Bond.

54.     Between 9:38 a.m., when Davis tipped Nothern via voicemail, and before 9:43 a.m., Nothern purchased $25 million in par value of 30-Year Treasury Bonds and tipped three other portfolio managers who also purchased $25 million, $10 million, and $5 million in par value of 30-Year Treasury Bonds, respectively. At approximately 9:51 a.m., Northern made an additional $14.25 million purchase of bonds for the portfolios he managed.

55. After public disclosure of the Treasury Department's decision to suspend issuance of the 30-Year Treasury Bond, Nothern and the three other MFS portfolio managers sold substantial holdings in 30-Year Treasury Bonds. MFS made profits of $3.1 million for the portfolios it managed.

## IMPACT OF THE IMPROPER TRADES PRIOR TO PUBLIC DISCLOSURE.

56. Officials within the Treasury Department who investigated suspicious trading activity the morning of October 31, 2001 concluded that the price of the 30-Year Treasury Bond began pronounced upward movement shortly after 9:30 a.m. Between 9:30 a.m. and 9:43 a.m., an early rally in the 30-Year Treasury Bond occurred as the result of buying by Goldman Sachs, MFS and other traders who Davis tipped. At 9:30 a.m. on October 31, 2001, the asking price of the 30-Year Treasury Bond was 102 18/32 (usually written as 102-18), meaning that dealers were asking $1025.625 for a $1,000 bond, or 102.5625 percent of the par value of the bond. Between 9:30 a.m. on October 31, 2001 and 9:44 a.m., the asked price of the 30-Year Treasury Bond increased from 102-18 to 102-23.

57. At 9:25 a.m. on October 31, 2001, the asking price of the 30-Year Treasury Future was approximately $108,500.00. By 9:43 a.m., the asking price of the 30-Year Treasury Future had risen to approximately $108,750.00. By 10:00 a.m., the asking price of the 30-Year Treasury Future had risen again to approximately $109,500.00. By 10:10 a.m., the asking price had risen to approximately $110,000.00.

58. The cost of covering short positions in 30-Year Treasury Options rose sharply between 9:25 a.m. and 9:43 a.m., 10:00 a.m., and 10:10 a.m. on October 31, 2001. This increase was a direct result of Defendants' trades in 30-Year Treasury Options and 30-Year Treasury Futures.

59.     Goldman Sachs' and MFS' improper purchases of 30-Year Treasury Bonds between 9:30 a.m. and 9:43 a.m. on October 31, 2001 significantly decreased the supply of 30-Year Treasury Bonds that would be available on the market at the time the Treasury Department publicly announced its decision.

60.     By purchasing significant amounts of 30-Year Treasury Bonds, Goldman Sachs and MFS also caused the demand for and price of the 30-Year Treasury Future to increase significantly prior to public disclosure of the Treasury Department's decision.   In addition, Goldman Sachs' significant purchases of 30-Year Treasury Futures, increased the demand for, and drove up the price of the 30-Year Treasury Future.  This had a corresponding impact on the market for 30-Year Treasury Options.

## THE TREASURY DEPARTMENT PUBLICLY DISCLOSED ITS DECISION.

61.     At approximately 9:43 a.m., the information from the refunding press conference was inadvertently posted on the Treasury Department's web site.  When news of suspension of the 30-Year Treasury Bond was made public, it materially affected the price of outstanding 30-Year Treasury Bonds.   At 9:57 a.m., Reuters news service reported on its newswire: "US Treasury Says Discontinuing Sales of Regular, Indexed 30-Year Treasury Bonds." At 9:57 a.m., the asked price increased again to 103-12. The asked price reached a high of 108-18 at 12:59 p.m. and closed at 107-25.  This was the largest one-day rally in price of the 30-Year Treasury Bond since the stock market crash of 1987.   The rally was caused by news of Treasury's suspension of issuance and sales of the 30-Year Treasury Bond.  The Treasury Department's public disclosure also led to a flurry of activity on the markets for the 30Year Treasury Futures and 30-Year Treasury Options.

62.     By the time the Treasury Department's announcement was publicly disclosed, the price of 30-Year Treasury Futures and Options had been distorted as a result of Defendants' improper trades.  Individuals and entities who held "short" positions were forced to cover their positions at prices far greater than they would have been in the absence of Goldman Sachs' and MFS' improper trades.

<u>DEFENDANTS ACTED WITH INTENT TO MANIPULATE THE MARKETS.</u>

63.     Davis' tips to Youngdahl and Nothern that sales of the 30-Year Treasury Bond would be suspended were material and nonpublic. There was a substantial likelihood that, under all the circumstances, knowledge of suspension of sales of the 30-Year Treasury Bond would have assumed actual significance in the deliberations of a reasonable investor.  The actual significance of this information is reflected by the fact that Goldman Sachs and MFS immediately traded on the information provided to them by Davis.  Goldman Sachs' and MFS' purchases of 30-Year Treasury Bonds and Goldman Sachs' purchases of 30-Year Treasury Bond futures are especially notable in light of the fact that bond traders usually do little trading before major announcements from the Treasury Department.

64.     Davis breached a duty of trust and confidence owed to the Treasury Department and public in general.  Rule 10b5-2(b)(l), 17 C.F.R § 240.10b5-2(b)(l), provides that a duty of trust and confidence exists for purposes of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder "whenever a person agrees to maintain information in confidence."  A federal criminal statute, 18 U.S.C. § 641, provides that any person who "knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any ... thing of value of the United States or of any department or agency thereof . . . Shall be fined under this title or

imprisoned not more than ten years, or both." For purposes of 18 U.S.C, § 641, information is a "thing of value."

65.    Goldman Sachs and Youngdahl knew Davis breached a duty of confidence. Youngdahl knew that Treasury refunding information was subject to an embargo and that Treasury intended that the October 31, 2001 embargo on that information would remain in effect until 10:00 am. Youngdahl had previously agreed that Davis would attend Treasury Department refunding press conferences with the intent to provide Youngdahl confidential material nonpublic Treasury Department information.    Davis provided to Youngdahl confidential nonpublic information that Treasury disclosed at the October 31, 2001 refunding press conference pursuant to Davis' and Youngdahl's July 2001 agreement.

66.    In addition, Youngdahl understood that because the Treasury Desk Managing Director was a member of the TBAC, he was, in effect, "quarantined" from contact with the firm on the days of refunding announcements, and that, for this reason, the Treasury Desk Managing Director absented himself from the trading desk on such mornings, including October 31, 2001. In fact, the Treasury Desk Managing Director stayed home on the morning of October 31, 2001, and he only called into the trading desk after he believed the refunding announcement had been made.

67.    Youngdahl knew the information Davis tipped on October 31, 2001 was material. Approximately one month earlier, on September 28, 2001, Youngdahl and other Goldman Sachs economists had published a written report entitled "U.S. Economics Analyst" in which Youngdahl predicted that Treasury would continue issuing the 30-Year Treasury Bond. On October 31, 2001, shortly before 9:30 a.m., Youngdahl advised employees on Goldman Sachs' Treasury Desk that Goldman Sachs' public position continued to be that the Treasury

Department would continue issuing the 30-Year Treasury Bond. Immediately upon receiving Davis' tip, Youngdahl suddenly reversed his position that the Treasury Department would continue to issue the 30-Year Treasury Bond, and abandoned the prediction he had publicly announced as recently as shortly before 9:30 a.m. that morning. Youngdahl immediately conveyed the information he received from Davis to the Senior Trader and at least one other Goldman Sachs' Treasury Desk trader because Youngdahl considered that information to be timely, accurate, and significant to the traders' decisions whether to sell or hold bonds.

68. MFS and Nothern knew Davis breached a duty of confidence. Nothern knew that Davis obtained the information he communicated to Nothern from Peter Fisher, a Treasury official with access to information concerning Treasury's issuance of debt securities. Nothern has admitted in sworn testimony before the Securities and Exchange Commission that Davis had in fact informed him about the embargo in the October 31, 2001 voice mail message. While in possession of the nonpublic information from Davis, Nothern purchased 30-Year Treasury Bonds and also tipped the three other IMFS portfolio managers when he knew or should have known that they would trade on the information.

## THE SEC ENFORCEMENT ACTION AND CRIMINAL PROCEEDINGS.

69. On September 4, 2003, news of Defendants' improper conduct began to emerge when the Securities and Exchange Commission announced three related enforcement actions arising from the improper conduct alleged herein. Davis and Youngdahl have already entered into a settlement decree with the Securities and Exchange Commission. In addition, Goldman Sachs consented to a Securities and Exchange Commission administrative order finding that the firm violated the anti-fraud laws applicable to broker-dealers and government securities broker-dealers. The Commission's order also found that Goldman Sachs lacked adequate safeguards to

prevent the misuse of material nonpublic information obtained from paid consultants. MFS also consented to a Securities and Exchange Commission administrative order finding that the firm lacked adequate safeguards to prevent the misuse of material nonpublic information obtained from paid consultants.

70.    Around the time the SEC filed its enforcement action, the United States Attorney General for the Southern District of New York charged Youngdahl and Davis with conspiracy and criminal insider trading. Davis has pled guilty to several criminal counts. On November 13, 2003, Youngdahl pled guilty to four criminal charges for insider trading, conspiracy, theft of government property and wire fraud. In a statement around the time of his guilty plea, Youngdahl expressed "deep regret for the pain I have caused." Youngdahl admitted that he conspired with Davis to obtain confidential information from Davis so that Goldman Sachs could trade on the information before public disclosure. Youngdahl also admitted lying to United States prosecutors and Securities and Exchange Commission lawyers.

<u>PLAINTIFF'S TRADING LOSSES.</u>

71.    Plaintiff suffered significant trading losses when it was forced to cover short positions in 30-Year Treasury Options at prices that were grossly inflated as a result of Defendants' conduct, including their improper trades in 30-Year Treasury Bonds and Futures.

72.    Between September 24 and October 25, 2001, Premium Plus Partners had sold 100 30-Year Treasury Call Options with a December 2001 expiration date and a strike price of 110-01 for total premiums of $24,109.68. On October 31, 2001, it was forced to cover this short position by buying offsetting Call Options for total premiums of $143,750.00, thereby suffering $119,640.32 in trading losses. Between October 1 and October 25, 2001, it had sold 126 30-Year Treasury Call Options with a December 2001 expiration date and a strike price of 111 01

for total premiums of $32,781.61. On October 31, 2001 it was forced to cover this position by buying offsetting Call Options for total premiums of $109,312.50, thereby suffering $76,530.61 in trading losses. Between September 28 and October 30, 2001, it had sold 34 30-Year Treasury Call Options with a December 2001 expiration date and a strike price of 112-01 for total premiums of $4,343.88. On October 31, 2001, it was forced to cover this short position buy buying offsetting Call options for total premiums of $15,405.42, thereby suffering trading losses of $11,062.54. On October 4, 2001, it had sold 10 Call Options on 30-Year Treasury Futures with an expiration date of December 2001 and a strike price of 113-01 for total premiums of $1,250.00. On October 31, 2001, it was forced to cover this short position by buying offsetting call options for total premiums of $2,500.00, thereby suffering trading losses of $1,250.00. On October 23, 2001, it had sold 5 30-Year Treasury Call Options with an expiration date of January 2002 and a strike price of 110-01 for total premiums of $1,328.15. On October 31, 2001, it was forced to cover this short position by buying offsetting Call Options for total premiums of $6,406.25, thereby suffering $5,078.10 in trading losses. Between October 19 and October 24, 2001, it had sold 45 30-Year Treasury Call Options for total premiums of $9,375.15. On October 31, 2001, it was forced to cover this short position by buying offsetting Call Options for total premiums of $44,609.60, thereby suffering trading losses of $9,375.15. In total, Premium Plus Partners, LP suffered $248,796.30 in trading losses on October 31, 2001 to cover the short positions outlined above.

73.     Most, if not all, of Plaintiff's trading losses were the direct and proximate result of Defendants' improper conduct, including their improper trades in 30-Year Treasury Bonds and Futures. Defendants' conduct, which had lowered the supply and increased the price of 30-Year Treasury Bonds, and increased the price of 30-Year Treasury futures, simultaneously drove up

the price of long positions in 30-Year Treasury Options. When Plaintiff was forced to cover its short positions in 30-Year Treasury options by purchasing offsetting long positions on October 31, 2001, it was forced to pay prices that were far greater than they would have been in the absence of Defendants' improper conduct.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the class defined in paragraph 1.

75.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are a minimum of thousands of members of the Class who traded during the Class Period.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.     Whether Defendants breached fiduciary duties;

b.     Whether Defendants violated the federal commodities laws;

c.     Whether Defendants conspired to violate the federal commodities laws;

d.     Whether Defendants manipulated the markets for 30-Year Treasury Bonds, Futures, and Options;

e.     Whether Defendants conspired to manipulate the markets for 30-Year Treasury Bonds, Futures, and Options;

f.     Whether Defendants violated the federal antitrust laws;

g.     Whether Defendants conspired to violate the federal antitrust laws;

h.      Whether Defendants restrained trade;

i.      Whether Defendants conspired to restrain trade;

j.      Whether the market prices for 30-Year Treasury Bonds, Futures, and Options were manipulated and distorted by Defendants' conduct;

k.      Whether Defendants' profited unlawfully through their conduct as alleged herein;

l.      Whether Class members have sustained damages and, if so, what is the proper measure of damages.

77.      Plaintiff's claims are typical of the claims of Class members. Plaintiff, like Class members, assumed short positions and sustained damages as a direct and proximate result of Defendants' wrongful conduct.

78.      Plaintiff will fairly and adequately represent and protect the interests of Class members and have retained counsel competent and experienced in complex class actions, including commodities, securities and antitrust litigation. Plaintiff has no interest antagonistic to or in conflict with those of the Class.

79.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

80.      For its claims under the federal commodities laws, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. 30-Year Treasury

Bonds, Futures and Options trade in an efficient market such that the misconduct of Defendants alleged herein was reflected in the price of those securities and commodities. Plaintiff and Class members purchased their 30-Year Treasury Futures and Options during the time Defendants engaged in the wrongful conduct alleged herein.

**COUNT I**

**COMMODITY EXCHANGE ACT CLAIM**
**AGAINST GOLDMAN SACHS AND YOUNGDAHL**

81.     Plaintiff incorporates Paragraphs 1 through 80, as if fully alleged herein.

82.     The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, makes it a felony for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity." 7 U.S.C. § 13(b).

83.     30-Year Treasury Futures and Options fall are "commodities" for purposes of the CEA.

84.     The CEA provides a private remedy for violations of the Act's substantive provisions. "Any person ... who violates this chapter or who willfully aids, abets, counsels, induces or procures the commission of a violation of this chapter shall be liable for actual damages ... to any other person" who meets certain criteria set forth in the private remedy provision. 7 U.S.C. § 25(a)(1). A person who "purchased or sold" a contract for "any commodity for future delivery (or option on such contract or any commodity)" has standing to sue under the CEA any defendant who violated the CEA through "manipulation of the price of any such contract or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(B) and (D). The CEA provides for "punitive or exemplary damages equal to no more

27

than two times the amount of actual damages" where defendant's violation is "willful and intentional." 7 U.S.C. § 25(a)(3)(B).

85. The 30-Year Treasury Bond and the 30-Year Treasury Bond Future are commodities underlying the 30-Year Treasury Bond Futures Option.

86. On October 31, 2001, Goldman Sachs and its traders, including Youngdahl, manipulated the price of 30-Year Treasury Bonds, Futures and Options. They did so by taking significant long positions in 30-Year Treasury Bonds and Futures prior to public release of the Treasury Department's decision that it would cease issuing 30-Year Treasury Bonds.

87. Plaintiff and the Class suffered damages as a direct and proximate result of Youngdahl and Goldman Sachs' conduct. Prior to public announcement of the Treasury Department's decision, the price of 30-Year Treasury Futures and Options had fluctuated to the detriment of individuals and entities who had assumed short positions in those commodities. Upon public disclosure of the Treasury Department's decision and as a proximate result of Goldman Sachs' improper trades, Plaintiff and the Class were forced to cover their short positions at prices far greater than would have existed in the absence of Goldman Sachs' improper trades.

88. Goldman Sachs and Youngdahl acted in a willful and intentional manner. They knew the information provided to them by Davis was material, nonpublic and confidential, and they intentionally traded on that information.

WHEREFORE, Plaintiff and the Class request all actual damages, punitive damages, attorneys' fees and costs warranted under the Commodity Exchange Act.

## COUNT II

## COMMODITY EXCHANGE ACT CLAIM
## AGAINST MFS AND NOTHERN

89.     Plaintiff incorporates Paragraphs 1 through 88, as if fully alleged herein.

90.     On October 31, 2001, MFS and its traders, including Nothern, manipulated the price of 30-Year Treasury Bonds, Futures and Options. They did so by taking significant long positions in 30-Year Treasury Bonds prior to public release of the Treasury Department's decision that it would cease issuing 30-Year Treasury Bonds.

91.     Plaintiff and the Class suffered damages as a direct and proximate result of MFS and Nothern's conduct. Prior to public announcement of the Treasury Department's decision, the price of 30-Year Treasury Futures and Options had fluctuated to the detriment of individuals and entities who had assumed short positions in those commodities. Upon public disclosure of the Treasury Department's decision and as a proximate result of MFS improper trades, Plaintiff and the Class were forced to cover their short positions at prices far greater than would have existed in the absence of MFS' improper trades.

92.     MFS and Nothern acted in a willful and intentional manner. They knew the information provided to them by Davis was material, nonpublic and confidential, and they intentionally traded on that information.

WHEREFORE, Plaintiff and the Class request all actual damages, punitive damages, attorneys' fees and costs.

## COUNT III

## COMMODITY EXCHANGE ACT CLAIM
## AGAINST DAVIS

93.     Plaintiff incorporates Paragraphs 1 through 92, as if fully alleged herein.

94.     Davis aided and abetted the manipulation of the 30-Year Treasury Bond, Futures and Options market by Goldman Sachs, Youngdahl, MFS and Nothern.    Davis provided Goldman Sachs (through Youngdahl) and MFS (through Nothern) with material nonpublic information concerning the Treasury Department's decision to cease issuance of the 30-Year Treasury Bond with knowledge that these individuals intended to trade thereon and with the intent to further their violations of the CEA.

95.     Plaintiff and the Class suffered damages as a direct and proximate result of the improper trading activity by Goldman Sachs and MFS in the 30-Year Treasury markets that were made as a direct result of Davis' improper tips.    Prior to public announcement of the Treasury Department's decision, the price of 30-Year Treasury Futures and Options had fluctuated to the detriment of individuals and entities who had assumed short positions in those commodities. Upon public disclosure of the Treasury Department's decision and as a proximate result of MFS improper trades, Plaintiff and the Class were forced to cover their short positions at prices far greater than would have existed in the absence of MFS' improper trades.

96.     Davis acted in a willful and intentional manner.    He knew the information he provided to Goldman Sachs and MFS was material, nonpublic and confidential, and that these entities and their traders would trade on the information.

WHEREFORE, Plaintiff and the Class request all actual damages, punitive damages, attorneys' fees and costs.

## COUNT IV

## ILLINOIS CONSUMER FRAUD ACT CLAIM
## AGAINST ALL DEFENDANTS

97.     Plaintiff incorporates Paragraphs 1 through 96 as if alleged fully herein.

98.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, provides, in pertinent part, "unfair or deceptive acts or practices, including but not limited to, the use or employment of any deception, fraud, pretence, false promise, misrepresentation, or the concealment, suppression or omission of any material fact, with the intent that others rely" thereon, "in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

99.     ICFA defines "merchandise" to include "any objects, wares, goods, commodities, intangibles, real estate … or services." 815 ILCS § 505/1(b). 30-Year Treasury Bonds, Futures and Options fall within ICFA's definition of "merchandise."

100.     ICFA provides a private remedy for the recovery of "actual economic damages," "reasonable attorney's fees and costs," and "any other relief." 815 ILCS § 505/10a(a) and (c).

101.     Defendants' conduct alleged herein was unfair and deceptive, and Goldman Sachs and MFS' improper trades in 30-Year Treasury Bonds as well as Goldman Sachs' improper trades in 30-Year Treasury Futures directly and proximately resulted in actual economic damages to Plaintiff and the Class.

102.     Defendants' manipulation of the prices for 30-Year Treasury Bonds, Futures and Options implicates consumer protection concerns and threatened the integrity of the securities and commodities markets in which consumers routinely trade.

WHEREFORE, Plaintiff and the Class request all actual economic damages, punitive damages, attorneys' fees and costs.

## COUNT V

### CIVIL CONSPIRACY
### AGAINST GOLDMAN SACHS, YOUNGDAHL AND DAVIS

103.    Plaintiff incorporates Paragraphs 1 through 102 as if alleged fully herein.

104.    Goldman Saks, Youngdahl, and Davis entered into a conspiratorial agreement whereby Davis would provide material non-public information concerning the Treasury Department's decision to stop issuing the 30-Year Treasury Bond. Youngdahl and the other traders on Goldman Sachs' Treasury Desk entered into a conspiratorial agreement whereby they agreed to trade in the 30-Year Treasury Bond markets based on the information provided to Youngdahl by Davis.

105.    Davis committed an overt, unlawful and tortious act in furtherance of the conspiracy when he provided material non-public information to Youngdahl and Goldman Sachs in violation of the federal securities laws, Treasury Department regulations, and federal criminal statutes. Youngdahl and the other traders on Goldman Sachs' Treasury Desk committed overt, unlawful and tortious acts in furtherance of the conspiracy when they executed trades in the 30-Year Treasury Bond and Futures markets based on Davis' unlawful tip.

106.    Plaintiff and the Class were directly and proximately injured by the conspiratorial agreements entered into by Goldman Sachs, Davis, Youngdahl and the other traders on Goldman Saks' Treasury Desk who purchased 30-Year Treasury Bonds and Futures.

WHEREFORE, Plaintiff and the Class request all actual damages, punitive damages, attorneys' fees and costs.

## COUNT VI

## CIVIL CONSPIRACY
## AGAINST MFS, NOTHERN AND DAVIS

107.   Plaintiff incorporates Paragraphs 1 through 106 as if alleged fully herein.

108.   MFS, Nothern, and Davis entered into a conspiratorial agreement whereby Davis would provide material non-public information concerning the Treasury Department's decision to stop issuing the 30-Year Treasury Bond. Nothern and the other traders at MFS entered into a conspiratorial agreement whereby they agreed to trade in the 30-Year Treasury Bond markets based on the information provided to Nothern by Davis.

109.   Davis committed an overt, unlawful and tortious act in furtherance of the conspiracy when he provided material non-public information to Nothern and MFS in violation of the federal securities laws, Treasury Department regulations, and federal criminal statutes. Nothern and the other traders at MFS committed overt, unlawful and tortious acts in furtherance of the conspiracy when they executed trades in the 30-Year Treasury Bond and Futures markets based on Davis' unlawful tip.

110.   Plaintiff and the Class were directly and proximately injured by the conspiratorial agreements entered into by MFS, Davis, Nothern and the other traders on at MFS who purchased 30-Year Treasury Bonds.

WHEREFORE, Plaintiff and the Class request all actual damages, punitive damages, attorneys' fees and costs.

## COUNT VII

## SHERMAN ANTITRUST ACT SECTION 1 CLAIM
## AGAINST GOLDMAN SACHS, YOUNGDAHL AND DAVIS

111.   Plaintiff incorporates Paragraphs 1 through 110 as if alleged fully herein.

112. Section 1 of the Sherman Antitrust Act makes "[e]very contract, combination …  or conspiracy, in restraint of trade or commerce among the several states … illegal." 15 U.S.C. § 1. Pursuant to Section 4 of the Clayton Act, private civil action may be brought by "any person who shall be injured in his business or property by reason of anything forbidding in the antitrust laws." 15 U.S.C. § 15(a). Section 4 of the Clayton Act allows recovery of three-times actual damages. 15 U.S. C. § 15(a).

113. Goldman Sachs, Youngdahl and Davis violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, when they conspired to restrain trade in the markets for 30-Year Treasury Bonds, Futures and Options. Youngdahl and Goldman Sachs agreed that Davis would provide them with advance knowledge concerning the Treasury Department's decisions in connection with the 30-Year Treasury Bond which Goldman Sachs would use to trade in the markets related to the 30-Year Treasury Bond.

114. Youngdahl and other Goldman Sachs traders agreed and conspired to use and in fact used this information to purchase significant amounts of 30-Year Treasury Bonds and Futures. Their agreement and conspiracy to purchase significant amounts of 30-Year Treasury Bonds and Futures were agreements and conspiracies in restraint of trade. Youngdahl and the other Goldman Sachs traders effectively decreased the supply of 30-Year Treasury Bonds and increased the price of 30-Year Treasury Bonds, Futures and Options immediately prior to and upon public disclosure of the Treasury Department's decision to stop issuing 30-Year Treasury Bonds.

115. The agreements and conspiracies between Davis, Youngdahl and other Goldman Sachs traders were effectively and inherently unreasonable and anticompetitive. Their concerted

activity diminished competition in the markets for 30-Year Treasury Bonds, Futures and Commodities without producing offsetting economic gains for anyone but themselves.

116. Plaintiff and the Class suffered damages as a direct and proximate result of Goldman Sachs, Youngdahl and Davis' conspiracy in restraint of trade. Plaintiff and the Class fell within the target area of these Defendants' anticompetitive conduct, as the markets for 30-Year Treasury Options are closely connected to and directly impacted by trading in the markets for 30-Year Treasury Bonds and Futures. As a result of these Goldman Sachs' improper trades, Plaintiff and the Class were required to cover their short positions in 30-Year Treasury Futures and 30-Year Treasury Options at *supra*-competitive prices that would not have existed in the absence of the conspiracy and Goldman Sachs' improper trading activity in 30-Year Treasury Bonds and Futures.

WHEREFORE, Plaintiff and the Class request all actual damages, treble damages, attorneys' fees and costs.

## COUNT VIII

### SHERMAN ANTITRUST ACT SECTION 1 CLAIM
### AGAINST MFS, NOTHERN AND DAVIS

117. Plaintiff incorporates Paragraphs 1 through 117 as if alleged fully herein.

118. Section 1 of the Sherman Antitrust Act makes "[e]very contract, combination … or conspiracy, in restraint of trade or commerce among the several states … illegal." 15 U.S.C. § 1. Pursuant to Section 4 of the Clayton Act, private civil action may be brought by "any person who shall be injured in his business or property by reason of anything forbidding in the antitrust laws." 15 U.S.C. § 15. Section 4 of the Clayton Act provides for treble damages.

119. MFS, Nothern and Davis violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, when they conspired to restrain trade in the markets for 30-Year Treasury Bonds,

Futures and Options. MFS and Nothern agreed that Davis would provide them with advance knowledge concerning the Treasury Department's decisions in connection with the 30-Year Treasury Bond which Nothern and other traders at MFS would use to trade in the markets related to the 30-Year Treasury Bond.

120.     Nothern and other MFS traders agreed and conspired to use and in fact used this information to purchase significant amounts of 30-Year Treasury Bonds. Their agreement and conspiracy to purchase significant amounts of 30-Year Treasury Bonds were agreements and conspiracies in restraint of trade. Nothern and the other MFS traders effectively decreased the supply of 30-Year Treasury Bonds and increased the price of 30-Year Treasury Bonds, Futures and Options immediately prior to and upon public disclosure of the Treasury Department's decision to stop issuing 30-Year Treasury Bonds.

121.     The agreements and conspiracies between Davis, Nothern and other MFS traders were effectively and inherently unreasonable and anticompetitive. Their concerted activity diminished competition in the markets for 30-Year Treasury Bonds, Futures and Commodities without producing offsetting economic gains for anyone but themselves.

122.     Plaintiff and the Class suffered damages as a direct and proximate result of MFS, Nothern and Davis' conspiracy in restraint of trade. Plaintiff and the Class fell within the target area of these Defendants' anticompetitive conduct, as the markets for 30-Year Treasury Options are closely connected to and directly impacted by trading in the markets for 30-Year Treasury Bonds. As a result of MFS' improper trades, Plaintiff and the Class were required to cover their short positions in 30-Year Treasury Futures and 30-Year Treasury Options at *supra*-competitive prices that would not have existed in the absence of the conspiracy and MFS' improper trading activity in 30-Year Treasury Bonds.

WHEREFORE, Plaintiff and the Class request all actual damages, treble damages, attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

(A)  Order that this action may proceed as a class action;

(B)  Enter an order finding Defendants liable for violations of the federal commodities and antitrust laws as well as the Illinois consumer protection laws;

(C)  Award Plaintiff and the Class actual and compensatory damages and treble and punitive damages in an amount to be determined at trial;

(D)  Award Plaintiff and the Class reasonable attorneys' fees, costs and expenses incurred in connection with this action;

(E) Grant such other and further relief as to the Court may seem just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury for all issues so triable.

Dated: March 10, 2004

Respectfully Submitted,
PREMIUM PLUS PARTNERS, L.P.,

By: _Anthony F. Fata_

Marvin A. Miller
Jennifer W. Sprengel
Anthony F. Fata
**MILLER FAUCHER AND CAFFERTY LLP**
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
Phone: (312)782-4480
Fax: (312)782-4485

Harry Rothenberg
**THE LAW OFFICES OF ALLEN ROTHENBERG**
450 Seventh Avenue, 11th Floor
New York, New York  10123

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**JUDGE FILIP**

MAGISTRATE JUDGE DENLOW

# Civil Cover Sheet  04C  1851

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use **only** in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):  PREMIUM PLUS PARTNERS, L.P.,** | **Defendant(s):PETER J. DAVIS, JR., et al.** |
| County of Residence:  Cook | County of Residence: |
| Plaintiff's Atty:  Miller Faucher and Cafferty LLP<br>30 North LaSalle Street, Suite 3200<br>Chicago, Illinois 60602<br>(312) 782-4880 | Defendant's Atty: |

II. Basis of Jurisdiction:  **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties **(Diversity Cases Only)**

Plaintiff:- **N/A**

Defendant:- **N/A**

IV. Origin :  **1. Original Proceeding**

V. Nature of Suit:  **850 Securities / Commodities / Exchange**

VI.Cause of Action:  **7 U.S.C. § 25**

VII. Requested in Complaint

Class Action: **Yes**

Dollar Demand:

Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:  _Anthony F. Fata_

Date:  _3.10.04_

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.

**JUDGE FILIP**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

MAGISTRATE JUDGE DENLOW

In the Matter of

**PREMIUM PLUS PARTNERS, L.P.,**

v.

**04C 1851**

Case Number:

**PETER J. DAVIS, JR., et al.,**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Premium Plus Partners, L.P., individually and on behalf of all others similarly situated, Plaintiff

FILED FD4

|  (A)  |  (B)  |
|---|---|
| SIGNATURE *Harry Rothenberg/mm* | SIGNATURE *Marvin A. Miller* |
| NAME  Harry Rothenberg | NAME  Marvin A. Miller |
| FIRM  The Law Offices of Allen Rothenberg | FIRM  Miller Faucher and Cafferty LLP |
| STREET ADDRESS 450 Seventh Avenue, 11th Floor | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP  New York, New York 10123 | CITY/STATE/ZIP  Chicago, Illinois 60602 |
| TELEPHONE NUMBER 594853005300   FAX NUMBER | TELEPHONE NUMBER (312) 782-4880   FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS  mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  01916769 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES X   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☑ | TRIAL ATTORNEY?   YES X   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES X   NO ☐ |

|  (C)  |  (D)  |
|---|---|
| SIGNATURE *Anthony F. Fata* | SIGNATURE *Jennifer W. Sprengel/mm* |
| NAME  Anthony F. Fata | NAME  Jennifer W. Sprengel |
| FIRM  Same as (B) | FIRM  Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS  afata@millerfaucher.com | E-MAIL ADDRESS  jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06269721 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |