IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Premium Plus Partners, L.P., individually, and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 04 C 1851 |
| Peter J. Davis, Jr., | ) | Hon. Mark Filip |
| John M. Youngdahl, | ) | |
| Goldman Sachs & Company, Inc., | ) | |
| Steven E. Nothern, | ) | |
| Massachusetts Financial Services | ) | |
| Company, | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Premium Plus Partners, L.P. ("Plaintiff"), on behalf of itself and others similarly

situated, brings this suit against Peter J. Davis, Jr. ("Davis"), John M. Youngdahl ("Youngdahl"),

Goldman Sachs & Company ("Goldman Sachs"), Steven E. Nothern ("Nothern"), and

Massachusetts Financial Services Company ("MFS") (collectively, "Defendants"). Plaintiff

alleges violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* (Counts I-III);

the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et*

*seq.* (Count IV); and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (Counts VII-VIII).

Plaintiff also alleges that Defendants variously participated in two state law civil conspiracies

(Counts V-VI).

There are six pending motions to dismiss. As explained below, Defendants' motions to

dismiss are denied in part and granted in part. Defendant Youngdahl's motion to dismiss for lack

of jurisdiction and/or venue (D.E. 50) is denied. Defendant Nothern's motion to dismiss for lack of jurisdiction and/or venue (D.E. 35) is granted. Defendants' various motions to dismiss under Rule 12(b)(6) (D.E. 32, 36-37, 49) are granted in part and denied in part. The motions to dismiss the CEA claims are denied. The antitrust claims are dismissed without prejudice. The state law claims are dismissed.

## BACKGROUND

This case arises from an approximately thirteen minute window of time on October 31, 2001, during which defendant Davis, an economic consultant, is alleged to have made some nine cellular telephone calls to various clients. Plaintiff alleges that during these calls Davis disclosed material non-public information regarding the United States Treasury Department's impending suspension of sales of the 30-Year Treasury Bond. Plaintiff alleges that certain Defendants traded on this information in the 30-Year Treasury Bond and 30-Year Treasury Futures markets prior to it becoming public. Such trading, Plaintiff contends, also resulted in investors like Plaintiff, who were not privy to the inside information, incurring substantial losses covering "short positions" in another financial market—the market for 30-Year Treasury Options.

Defendants' purchases in the 30-Year Bond and 30-Year Futures markets took place during an approximately eight minute window of time immediately prior to public release of the inside information. During the period leading up to the information becoming public, the market for 30-Year Bonds and 30-Year Futures is alleged to have moved upward by some fifteen to twenty-three basis points, or .15 to .23 %. After the inside information became public, according to Plaintiff's own account of events, the information triggered the largest price rally in the 30-Year Bond market in some fifteen years, producing an approximately 6% price increase in the

wake of the information's release on October 31, 2001. Plaintiff did not cover its positions in the Options market until after the information's public release. Plaintiff is not alleged to have traded in any market in which any of the Defendants traded; Plaintiff also is not alleged to have traded in any market when Defendants allegedly were engaging in prohibited securities transactions.

The parties' views about the consequences of the alleged insider trading differ materially. Plaintiff contends that Defendants, by purchasing 30-Year Treasury Bonds or Futures (but not Options, the market in which Plaintiff exclusively participated), manipulated the price of all of those financial instruments in violation of the Commodity Exchange Act, the federal antitrust laws, and the Illinois Consumer Fraud and Deceptive Business Practices Act. Defendants, on the other hand, contend that Plaintiff, who concededly does not have standing to bring an orthodox insider trading case, is improperly attempting to shoehorn allegations of insider trading into legally defective claims.

I.      The Parties

        A.      Plaintiff

Plaintiff is an Illinois limited partnership that held substantial short positions in 30-Year Treasury Options as of 9:25 a.m. eastern standard time on October 31, 2001. (Compl. ¶ 10.) Plaintiff contends that it represents a class of plaintiffs comprised of "[a]ll individuals and entities who held short positions in 30-Year Treasury Futures or 30-Year Treasury Options" as of that time and date and "who covered such short positions at any time thereafter." (*Id.* ¶ 1.)

        B.      Defendants

Defendants are various individuals and entities involved in the securities industry. Defendant Davis, a resident of Washington, D.C., is an economist who runs a sole proprietorship,

3

Davis Capital Investment Ideas. (*Id.* ¶ 13.) Through his business, Davis sells his analyses of political and financial events to broker-dealers, financial analysts, and investors. (*Id.*)

Defendant Youngdahl is a resident of New Jersey. (*Id.* ¶ 14.) At times relevant to the case, Youngdahl was a Senior Economist in Defendant Goldman Sachs's New York-based Global Economics Group. (*Id.*) He also sat on the Goldman Sachs Treasury Desk in New York, advising traders on that desk regarding relevant economic developments. (*Id.*)

Defendant Nothern is a resident of Massachusetts. (*Id.* ¶ 15.) At times relevant to the case, Nothern was a Senior Vice President at MFS whose duties included managing several fixed-income mutual funds, including a fund that invested in Treasury issues. (*Id.*)

Defendant MFS is a Boston, Massachusetts investment company. (*Id.* ¶ 12.) Defendant Goldman Sachs is a New York based investment company. (*Id.* ¶ 11.) Goldman Sachs and MFS were, at times relevant to Plaintiff's allegations, clients of Davis. (*Id.* ¶ 13.)

C.      Davis's Relationship with Goldman Sachs

Youngdahl, who was employed by Goldman Sachs, first met Davis in mid-February 2001. (*Id.* ¶ 31.) Davis explained that he knew people in Washington, D.C., and that he could provide Youngdahl with useful information about developments in the nation's capital. (*Id.*) Goldman Sachs later retained Davis in reliance on Youngdahl's recommendation. (*Id.* ¶ 32.) From Spring 2001 through at least October 2001, Youngdahl received daily e-mails from Davis and spoke with Davis by phone approximately once a week. (*Id.*) Davis knew that Youngdahl sat on a Goldman Sachs's Treasury desk. (*Id.*)

D.      Davis's Relationship with MFS

Nothern, an employee of MFS, has known Davis since the mid-1990s. (*Id.* ¶ 36.) MFS

first retained Davis sometime before 1997. (*Id.*) Nothern was Davis's primary contact at MFS. (*Id.*) Davis sent Nothern e-mails approximately three times a week, as well as periodic facsimiles that included copies of Treasury Department press releases. (*Id.* ¶ 37.)

II.     Treasury Bonds, Futures, and Options

      A.     The 30-Year Treasury Bond

Among the debt obligations that the United States Treasury Department issues are bonds that mature at a term of 30 years (the "30-Year Treasury Bond" or "30-Year Bond"). (*Id.* ¶ 16.) The 30-Year Treasury Bond, according to Plaintiff, plays an important role in trading for a wide variety of other financial instruments, and it is the financial instrument underlying the 30-Year Treasury Future and 30-Year Treasury Option. (*Id.* ¶ 17.) Plaintiff alleges that the 30-Year Treasury Bond has historically served as an important benchmark for other United States government bonds and for the bond market generally. (*Id.*)

Plaintiff alleges that a public announcement that the Treasury Department will suspend issuance of the 30-year Treasury Bond will drive up the price of previously issued 30-Year Treasury Bonds because traders anticipate a shortage of those bonds. (*Id.*) Plaintiff further alleges that traders with advance knowledge that the Treasury Department will suspend a bond can realize profit by purchasing bonds before the announcement and selling the bonds at a price greater than the purchase price immediately afterwards. (*Id.*)

      B.     The 30-Year Treasury Bond Future

Individuals and entities trade, among other things, 30-Year United States Treasury Bond Futures ("30-Year Treasury Future") on the Chicago Board of Trade ("CBOT"). (*Id.* ¶ 18.) A seller of a 30-Year Treasury Future assumes a "short" position and agrees to deliver $100,000 in

30-Year Treasury Bonds to a buyer for an agreed price at an agreed date. (*Id.*) A buyer of a 30-Year Treasury Future assumes a "long" position and agrees to take delivery of $100,000 in 30-Year Treasury Bonds for an agreed price in a specified contract month. (*Id.*)

Plaintiff contends that the public announcement that the Treasury Department will suspend issuance of the 30-Year Bond disfavors the seller (the holder of the "short position") of a 30-Year Treasury Future, who must procure 30-Year Treasury Bonds at a greater cost. (*Id.*) Plaintiff contends that such news, however, benefits the buyer of a 30-Year Treasury Future (who holds the "long position"), because the buyer can potentially realize the difference between the agreed-upon price set forth in the futures contract and the price at which the 30-year Treasury Bond trades. (*Id.*)

C.     The 30-Year Treasury Bond Option

Individuals and entities also trade options on 30-Year Treasury Bonds ("30-Year Treasury Options") on the CBOT. (*Id.* ¶ 19.) Plaintiff alleges that the financial instruments underlying the 30-Year Treasury Options are the 30-Year Treasury Bond and the 30-Year Treasury Future. (*Id.*) The 30-Year Treasury Options come in two forms: "put" options and "call" options. (*Id.*)

The buyer of a 30-Year Treasury Put Option purchases the right to assume a "short" position in one 30-Year Treasury Bond Futures contract of a specified contract month at a striking price set at the time the option was purchased. (*Id.* ¶ 20.) The seller of a 30-Year Treasury Put Option agrees to assume a "long" position in a 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was sold. (*Id.*)

The buyer of a 30-Year Treasury Call Option purchases the right to assume a "long" position in one 30-Year Treasury Futures contract of a specified contract month at a striking

6

price set at the time the option was purchased. (*Id.* ¶ 21.) The seller of a 30-Year Treasury Call Option agrees to assume a short position in a 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was sold. (*Id.*)

III.    Treasury Department Confidential Press Conferences

The Treasury Department discloses news concerning the federal government's financing requirements at quarterly press conferences. (*Id.* ¶ 22.) These announcements sometimes include details about the Treasury Department's plans to issue, suspend, or buy back its bonds in the coming quarter. (*Id.*) Attendees at these conferences are obligated to maintain strict confidentiality of any disclosed information during an "embargo" period, the length of which is announced at the conferences. (*Id.*)

Defendant Davis had been attending the Treasury Department's quarterly refunding press conferences since 1994. (*Id.* ¶ 25.) Davis agreed to preserve the confidentiality of any embargoed information that he learned by attending any refunding press conference. (*Id.* ¶ 26.)

On October 31, 2001, Davis attended a confidential Treasury Department quarterly refunding conference. (*Id.* ¶ 40.) Davis was in attendance with 30 to 50 other individuals. (*Id.*) Davis attended the press conference from 9:00 a.m. until approximately 9:25 a.m. (*Id.*)

At the conference, a Treasury Department spokesperson informed attendees that the Department would announce its intention to suspend the issuance of the 30-Year Treasury Bond later that morning and that such information was embargoed until 10:00 a.m. (*Id.* ¶ 42.)

IV.    Davis Discloses Confidential Information to Goldman Sachs and MFS

Davis failed to observe the embargo. Between the time Davis left the October 31, 2001, conference, at approximately 9:25 a.m., and 9:43 a.m., Davis made nine cellular phone calls to

7

eight of his clients, including Youngdahl at Goldman Sachs and Nothern at MFS. (*Id.* ¶ 44.) Specifically, at 9:35 a.m., Davis called Youngdahl at the Goldman Sachs Treasury Desk. (*Id.* ¶ 45.) Davis informed Youngdahl that the Treasury Department would suspend sales of the 30-Year Treasury Bond. (*Id.*) Davis also informed Youngdahl that the Treasury Department would change its buyback program. (*Id.*) Plaintiff alleges that Davis knew or should have known that Youngdahl would tip others to trade in the 30-Year Bond market and related markets. (*Id.*)

At approximately 9:38 a.m., Davis phoned Nothern and left a voicemail message stating that the Treasury Department would cancel the 30-Year Treasury Bond. (*Id.* ¶ 51.) Davis also indicated in the voicemail message that the information was embargoed until the Treasury Department released a press announcement of the cancellation at 10:00 a.m. (*Id.* ¶ 51.) Nothern retrieved this voicemail message almost immediately. (*Id.* ¶ 52.) Plaintiff alleges that Davis also knew or should have known that Nothern would trade on the nonpublic information or would tip others to trade 30-Year Treasury Bonds. (*Id.* ¶ 51.)

V.    Defendants Trade on Confidential Information

A limited number of employees of Defendant Goldman Sachs allegedly traded on the confidential information that Davis disclosed regarding 30-Year Treasury Bonds. Before the information became public at 9:43 a.m., employees at Goldman Sachs's Treasury Desk purchased $84 million in par value of 30-Year Treasury Bonds. (*Id.* ¶ 48.) Goldman Sachs's Treasury Desk subsequently sold the $84 million in bonds after the news became public, realizing profits of $4.3 million dollars. (*Id.* ¶ 50.)

A limited number of employees of Defendant MFS also allegedly traded on the confidential information concerning the 30-Year Treasury Bond. Before the information became

8

public, Nothern purchased $25 million in par value of 30-year Bonds. (*Id.* ¶ 54.) Three MFS portfolio managers also purchased a total of $40 million in par value of 30-Year Treasury Bonds. (*Id.*) After the information became public, MFS sold substantial holdings in 30-Year Treasury Bonds, realizing $3.1 million in profits for MFS portfolios. (*Id.* ¶ 55.)

At approximately 9:43 a.m., the information from the refunding press conference was posted on the Treasury Department's internet web site. (*Id.* ¶ 61.) Plaintiff alleges that when news of the suspension of the 30-Year Treasury Bond became public, it materially affected the price of outstanding 30-Year Treasury Bonds. (*Id.*) In this regard, the ask price for 30-Year Treasury Bonds increased, triggering the largest one-day rally in the price of 30-Year Treasury Bonds since 1987. (*Id.*) In the wake of the public release of the information on October 31, 2001, the price of 30-Year Bonds increased by some 6%. (*Id.*) The Treasury Department's public disclosure also prompted substantial activity in the markets for 30-Year Treasury Futures and 30-Year Treasury Options. (*Id.*)

Plaintiff alleges that it suffered trading losses when it was forced to cover short positions in 30-year Treasury Options at prices that were inflated as a result of Defendants' conduct. (*Id.* ¶ 71.) In this regard, Plaintiff alleges that it suffered $248,796.30 in losses on October 31, 2001, as a consequence of being "forced" to cover certain short positions at that time. (*Id.* ¶ 72.)

## ANALYSIS

VI.    Personal Jurisdiction

Defendants Nothern and Youngdahl have each moved to dismiss Plaintiff's complaint on the ground that this Court does not have personal jurisdiction over them and/or the Northern

9

District of Illinois is an improper venue as to them. (D.E. 35; D.E. 50.) For the following reasons, Nothern's motion is granted and Youngdahl's is denied.

A.    Standard for a Federal Rule 12(b)(2) Motion

Federal Rule of Civil Procedure 12(b)(2) provides a defendant a procedural mechanism to challenge a federal district court's exercise of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). Once a defendant moves to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 548 (7th Cir. 2004) (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). The Court draws all reasonable inferences consistent with the complaint in favor of the plaintiff. *See Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GmbH*, 185 F. Supp. 2d 897, 904 (N.D. Ill. 2002) (citing *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999)).

If a district court rules on a defendant's motion to dismiss for lack of personal jurisdiction based on the submission of written materials, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Research*, 338 F.3d at 782 (collecting cases; internal quotations omitted). The Seventh Circuit instructs that "[i]n evaluating whether the *prima facie* standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Id.* (quoting *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)). However, if the defendant submits affidavits or other evidence in opposition, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783.

10

B.      Plaintiff Has Not Made a *Prima Facie* Showing That This Court Has Personal
        Jurisdiction Over Nothern

Plaintiff must make a *prima facie* showing that the Court has personal jurisdiction over

Nothern.  The Seventh Circuit has held that in federal question cases (as this case is, at least in

part), a plaintiff must establish two things to demonstrate personal jurisdiction over a defendant.

The plaintiff, at least in cases involving statutes that provide for nationwide service of process, as

Nothern concedes is the case here (D.E. 35 at 5), must demonstrate that: (1) haling the defendant

into court accords with the Due Process Clause of the Fifth Amendment; and (2) the defendant is

amendable to service of process from the court. *See, e.g.*, *United States v. De Ortiz*, 910 F.2d

376, 381-382 (7th Cir. 1990); *see also Perry v. Delaney*, 5 F. Supp. 2d 617, 619 (C.D. Ill. 1998);

*Lifeway Foods, Inc. v. Fresh Made, Inc.*, 940 F. Supp. 1316, 1318 (N.D. Ill. 1996).  As discussed

below, Plaintiff has not met its burden with respect to Nothern.

Nothern argues that this Court does not have personal jurisdiction over him, pointing out,

among other things, that he does not live in Illinois, does not own any real estate or any other

valuable asset in Illinois, is not an officer or director of an Illinois corporation, and is not a party

to an Illinois contract. (*See* D.E. 35 at 4-10; Nothern Aff. ¶¶ 2, 12-13.)  In response, Plaintiff

argues that its claim "against Nothern is for manipulation of [Treasury Bonds,] the commodity

underlying the Treasury Options[,] which Plaintiff purchased on the Chicago Board of Trade."

(D.E. 46 at 3.)  Plaintiff notes that the CBOT is located in this district.  (*Id.*)  Plaintiff further

contends that "the Court has jurisdiction over Nothern for his conduct which severely impacted

Plaintiff . . . in the Northern District of Illinois under 7 U.S.C. § 25(c)." (*Id.*)  In support of this

contention, Plaintiff states that under 7 U.S.C. § 25(c), "CEA claims [are] appropriately brought

11

in any judicial district wherein any act or transaction constituting the violation occurs." (*Id.*)

The Court notes that Plaintiff has based its jurisdictional argument with respect to Nothern entirely on federal statutory grounds. Put differently, and as discussed below, Plaintiff's sole basis for arguing that this Court has personal jurisdiction over Nothern rests on a nationwide service of process argument. As a consequence, Plaintiff has forgone any argument that this Court's exercise of personal jurisdiction would be proper under Federal Rule of Civil Procedure 4(k)(1)(A), which would require the Court to determine whether Nothern "could be subjected to the jurisdiction of a court of general jurisdiction" in Illinois. Fed. R. Civ. P. 4(k)(1)(A). The Court, therefore, turns to the issue of whether this Court's exercise of personal jurisdiction over Nothern would be founded properly under the CEA, keeping in mind that Plaintiff has the burden to demonstrate a *prima facie* case for jurisdiction.

To determine whether a defendant is amenable to process from the court in a federal question case, a district court first looks to the applicable federal statute. *See De Ortiz*, 910 F.2d at 382 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 105 (1987)). The section of the CEA that Plaintiff identifies appears to provide—in plain language—for nationwide service of process in suits alleging violations of 7 U.S.C. § 25(a). In this regard, 7 U.S.C. § 25(c) provides, in relevant part, that "[p]rocess [in an action brought under subsection (a) of this section] may be served . . . wherever the defendant may be found." 7 U.S.C. § 25(c); *see also Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 185 (3rd Cir. 2000) (discussing the Senate Report on the Futures Trading Practices Act of 1992, S. Rep. No. 102-22, which states that the Act "amends [sub]section 22(c) of the Commodity Exchange Act to authorize nationwide service of process in . . . private actions brought under [sub]section 22(a) of the Act"). And subject to a

qualification discussed below, Nothern concedes that 7 U.S.C. § 25(c) "authorizes nationwide service of process in actions under [Section 25(a)]." (D.E. 35 at 5.)

Plaintiff appears to allege in his Complaint that Nothern is liable to Plaintiff under 7 U.S.C. § 25(a). (*See* Compl. ¶ 90 ("Nothern . . . manipulated the price of 30-Year Treasury Bonds, Futures and Options."); *see also* D.E. 46 at 3 (Plaintiff stating, in response to Nothern's personal jurisdiction arguments, that Plaintiff's claim against Nothern "is for manipulation of the commodity underlying . . . Treasury Options").) Section 13(a)(2) of the CEA makes it unlawful for any person, among other things, "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2).[1] Section 25(a)(1)(D) of the CEA creates a private cause of action against persons, subject to exceptions that do not appear applicable here, who "manipulat[e] . . . the price of [a contract of sale of any commodity for future delivery or option on such contract or any commodity] or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(D); *see also* 7 U.S.C. § 25(a)(1)(B).

"Under the Federal Rules of Civil Procedure, the service of a summons upon a defendant is effective to establish personal jurisdiction over the defendant in certain situations." *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 807 n.3 (7th Cir. 2002). In this regard, when a federal

---

[1]     Plaintiff purports to quote 7 U.S.C. § 13(b) in paragraph 82 of its complaint, which Plaintiff states makes it unlawful "for any person 'to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner or attempt to corner any such commodity.'" (Compl. ¶ 82.) The Futures Trading and Practices Act of 1992, however, recodified and renumbered Section 9(b) of the CEA, 7 U.S.C. § 13(b), as Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2). *See* Pub. L. No. 102-546 § 212(a)(1)(A), (C); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.4 (S.D.N.Y. 1998).

statute that creates a cause of action prescribes its own rules for service of process, "the Federal Rules provide that service made according to the statute is effective to establish personal jurisdiction over the defendant, regardless of whether a court of the state encompassing the federal district could exercise personal jurisdiction over the defendant." *Id.* (citing Fed. R. Civ. P. 4(k)(1)(D) and collecting cases). In such a case, the personal jurisdiction analysis turns on whether the defendant has certain minimum contacts with the United States as a whole, such that this Court's exercise of personal jurisdiction over the defendant would not violate the Due Process Clause of the Fifth Amendment. *See, e.g., id.* (collecting cases); *see also Cent. States, S.E. and S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 n.10 (7th Cir. 2000).

The third sentence of Section 25(c) provides, in relevant part, that an action under Section 25(a) "may be brought . . . in the judicial district wherein any act or transaction constituting the violation occurs." 7 U.S.C. § 25(c). Nothern asserts that "Section [25(c)] . . . authorizes nationwide service of process in actions under Section [25(a)] . . . *provided* that the statutory requirements for venue [as set forth in the third sentence of Section 25(c)] have been satisfied." (D.E. 35 at 5 (internal citation omitted; emphasis in original).) Nothern further states that "it is not uncommon for Congress to condition service in such situations on the satisfaction of explicit venue requirements." (*Id.* at 5 n.1) Neither party cites any authority directly on point regarding how the venue language contained in the third sentence affects the personal jurisdiction analysis here.[2] Plaintiff has apparently assumed that Nothern has correctly stated the law, and Plaintiff

---

[2]    Nothern supports his position with a citation to *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, No. 00-5663, 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001). *Yellow Page Solutions*, while generally consistent with Nothern's position, is a case involving

does not contest Nothern's interpretation of Section 25(c). Moreover, in Plaintiff's response to Youngdahl's motion to dismiss for lack of personal jurisdiction, Plaintiff states that "[t]he fundamental question for purposes of personal jurisdiction under the CEA is whether any acts or transactions constituting the CEA violations occurred in the [Northern District of Illinois]," which is language drawn from 7 U.S.C. § 25(c). (D.E. 57 at 3.) The Court therefore adopts the parties' assumption for purposes of resolving the motion before the Court. *See generally, e.g.*, *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1399 (7th Cir. 1993) ("Unlike subject matter jurisdiction, which as a restriction on federal power cannot be waived, personal jurisdiction is 'a legal right protecting the individual,' which the defendant may waive.") (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982)).[3]

> 1.  An Act or Transaction Constituting Nothern's Alleged CEA Violation Did Not Occur in This District

Plaintiff apparently contends that this Court has jurisdiction over Nothern because

---

Section 12 of the Clayton Act. *Id.*

[3]     The Court states that it proceeds on the basis of the parties' assumption because, although no party cites a case addressing the specific jurisdictional issue implicated by this suit, the Third Circuit Court of Appeals has construed the third sentence of Section 25(c) "as directed to venue rather than to *in personam* jurisdiction." *Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 185 (3rd Cir. 2000). The Court notes that to the extent the Third Circuit's interpretation is correct, Nothern would still appear to be subject to dismissal for lack of venue, which is also a basis for his motion to dismiss. (*See* D.E. 35.) In addition, proceeding on the basis of the parties' understanding of the issues presented by Nothern's (and Youngdahl's) motions does not create any risk that the Court is impermissibly expanding its jurisdiction. *See United Steelworkers of Am. v. Libby, McNeill & Libby, Inc.*, 895 F.2d 421, 423 n.2 (7th Cir. 1990) ("Jurisdiction cannot be created merely by consent of the parties.") (citing *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986)). Nothern is subject to dismissal either way, and there would be jurisdiction over Youngdahl and venue would be proper as to him under either view.

Plaintiff felt the "impact" of Nothern's alleged CEA violation in the Northern District of Illinois. (*See* D.E. 46 at 3.) As best the Court can tell, Plaintiff takes the position that this "impact" is an "act or transaction constituting the [CEA] violation" within the meaning of Section 25(c). 7 U.S.C. § 25(c). Nothern responds that Plaintiff's "contention that the *effects* of [Nothern's alleged CEA violations] were felt in Illinois" is not determinative to an analysis under 7 U.S.C. § 25(c). (D.E. 70 at 2-3 (emphasis in original).) Based on the factual record presently before the Court, the Court agrees with Nothern.[4]

Plaintiff alleges that Nothern violated the CEA by "manipulat[ing] the price of 30-Year Treasury Bonds, Futures and Options." (Compl. ¶ 90.) Nothern is alleged to have done so by "taking significant long positions in 30-Year Treasury Bonds prior to public release of the Treasury Department's decision that it would cease issuing 30-Year Treasury Bonds." (*Id.*) Plaintiff does not contend that Nothern purchased any Bonds whatsoever on the CBOT (Plaintiff alleges "[t]he vast majority of the trading volume of 30-Year Treasury Bonds occurs in the over-the-counter market" (Compl. ¶ 17)) or elsewhere in the Northern District of Illinois. In fact, Plaintiff does not respond to Nothern's affidavit testimony that all of the underlying acts comprising his alleged CEA violation occurred in Massachusetts, New Jersey, and New York.

---

[4]     Nothern argues that "an 'impact theory' of personal jurisdiction has been resoundingly rejected as inconsistent with fundamental principles of due process." (D.E. 70 at 2.) In support of this statement, Nothern cites *Young v. Colgate-Palmolive Co.*, 790 F.2d 567, 572 (7th Cir. 1986). That case, however, is inapposite because it is a diversity case, and the due process analysis conducted by the court regarding an "impact theory" was in the context of certain defendants' contacts with Illinois. *Id.* at 568-69. Such an analysis is fundamentally different than the analysis here, which would, given that there is a statute that provides for nationwide service of process, require the Court to look to Nothern's contacts with the United States as a whole. The focus here is on the proper reading of the third sentence of 7 U.S.C. § 25(c), which the parties agree is the relevant language for purposes of the personal jurisdiction analysis.

(D.E. 35 at 2; Nothern Aff. ¶¶ 6-9.)

The alleged violation in this case is grounded in 7 U.S.C. § 13(a)(2), which renders it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to corner or attempt to corner any such commodity . . . ." 7 U.S.C. § 13(a)(2). Plaintiff alleges that 30-Year Treasury Bonds and 30-Year Treasury Futures are "[t]he financial instruments or commodities underlying 30-Year Treasury Options." (Compl. ¶ 19.)

The issue then, as the parties have framed it, is whether any act or transaction constituting Nothern's alleged manipulation occurred in the Northern District of Illinois. Plaintiff does not argue that it has. In fact, Plaintiff does not allege that any act by or associated with Nothern was performed in this district. Rather, Plaintiff contends that it felt the "impact" of Nothern's alleged manipulation in this district. In this regard, Plaintiff's opposition makes clear that Nothern did not engage in any trades on the CBOT. Instead, Nothern is alleged to have purchased Treasury Bonds, which purchase manipulated, among other prices, the prices for Treasury Options, although the purchase of Treasury Bonds did not occur in the Northern District of Illinois. Plaintiff states that its "claim against Nothern is for manipulation of the commodity underlying the Treasury Options which *Plaintiff* purchased on the Chicago Board of Trade." (D.E. 46 at 3 (emphasis added).)

The parties did not address the scope of the operative venue language in their briefs, and the Court was unable to find any case law interpreting the relevant language of 7 U.S.C. § 25(c). The legislative history related to the provision is unhelpful in that the only language that the Court was able to find that addresses it provides that "the special venue provisions for section

17

22(a) actions grant a plaintiff greater choice in selecting the forum in which to bring an action." S. Rep. No. 102-22, at 58 (1991), *reprinted in* 1992 U.S.C.C.A.N. 3103. In the absence of further authority, the issue then appears to be whether a material part of the CEA manipulation violation alleged took place in the Northern District of Illinois. In that regard, the Court holds that the impact of a CEA violation is not a part of the illegal events that constitute the violation, but rather it is a purported consequence of the alleged violation.

Plaintiff's allegations with respect to Nothern do not meet its burden of demonstrating that this Court has personal jurisdiction over Nothern and/or that venue is proper as the parties have framed the issue. Nothern's motion to dismiss for lack of personal jurisdiction and/or venue is granted.

C.   Plaintiff Has Made a *Prima Facie* Case That the Court Has Personal Jurisdiction Over Youngdahl

Defendant Youngdahl has also moved to dismiss for, among other things, lack of personal jurisdiction and/or improper venue. (D.E. 50.) In doing so, Youngdahl has "adopt[ed] and incorporate[d] the arguments and authorities in the Nothern Motion and Memorandum as applicable to him."[5] (*Id.* at 1.) Youngdahl argues that "Plaintiff has failed to identify a statutory grant of jurisdiction or allege facts that provide this Court with personal jurisdiction over [him]." (*Id.*) Youngdahl also emphasizes "that all the alleged acts involving him that form the basis of Plaintiff's complaint occurred outside the State of Illinois and fail to provide this Court with a

---

[5]      Youngdahl, by adopting Nothern's arguments, also concedes that Section 25(c) provides for nationwide service of process. (D.E. 50 ¶ 1.)

18

basis to exercise personal jurisdiction over him." (*Id.* at 1-2.)[6]

Plaintiff argues that this Court has personal jurisdiction over Youngdahl under 7 U.S.C. § 25(c). (D.E. 57 at 3-4.) In this regard, Plaintiff argues that "Youngdahl's alleged CEA violations include trading Treasury Futures on the Board of Trade in the Northern District of Illinois and manipulating the price of Treasury Futures and Options traded on the Board of Trade through improper trading in Treasury Bonds." (*Id.* at 4.) Put differently, Plaintiff contends that "the acts or transactions constituting Youngdahl's CEA violations took place on the Board of Trade in this District" within the meaning of 7 U.S.C. § 25(c). (*Id.*) Youngdahl responds that jurisdiction is not supported by 7 U.S.C. § 25(c) because "the alleged acts and transactions engaged in by [him] that form the basis of Plaintiff's claim occurred in New York." (D.E. 74 at 3.) Youngdahl contends that "[b]ecause no act or transaction forming the basis of [his] alleged violation of the CEA occurred in Illinois, this Court cannot exercise personal jurisdiction over him." (*Id.*)

As set forth above, Plaintiff must make out a *prima facie* case of personal jurisdiction with respect to Youngdahl. *See Purdue Research*, 338 F.3d at 782. Plaintiff "'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Id.* (quoting *Nelson*, 717 F.2d at 1123)). Youngdahl's affidavit is not presently before the Court (*see* note six, *supra*), so Plaintiff need not "go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783.

---

[6]     The Court notes that Plaintiff filed a "Motion to Strike Defendant Youngdahl's Reply Memorandum in Further Support of His Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue." (D.E. 76.) The Court granted that motion in part on January 19, 2005. (D.E. 82.) In this regard, the Court held that it would "disregard the factual assertions set forth for the first time in the reply and will strike the Youngdahl declaration." (*Id.*) The Courts notes the following analysis takes into consideration the January 19, 2005, ruling for purposes of addressing Youngdahl's personal jurisdiction arguments.

With respect to Plaintiff's *prima facie* case of this Court's personal jurisdiction over Youngdahl, there is no question that this Court's exercise of personal jurisdiction would be permissible under the Due Process Clause of the Fifth Amendment. (The focus in this instance is on Youngdahl's contacts with the United States as a whole.) The Court, therefore, turns to the issue of whether Youngdahl is amenable to service of process, focusing on whether, as the parties have framed it, Plaintiff has alleged that "any act or transaction constituting [Youngdahl's alleged CEA violation occurred]" in the Northern District of Illinois. 7 U.S.C. § 25(c).

Unlike Plaintiff's personal jurisdiction and venue arguments with respect to Nothern, Plaintiff argues, among other things, that Youngdahl traded in the Northern District of Illinois in connection with the alleged CEA violation. (D.E. 57 at 3-4). In response, Youngdahl argues that he did not, but given that Youngdahl's declaration has been stricken, the Court is merely left with competing versions of the events, both of which are unsupported by record evidence. The paragraphs of the Complaint that Plaintiff identifies do not expressly support Plaintiff's contention that Youngdahl traded on the CBOT. That stated, the Court notes that such an argument is not inconsistent with Plaintiff's allegations either. *See Wachovia Sec. LLC v. Neuhauser*, No. 04-3082, 2004 WL 2526390, at *3 (N.D. Ill. Nov. 5, 2004). At this stage of the litigation, Plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record. *See Purdue Research*, 338 F.3d at 782. Moreover, the "[the Court] must draw all reasonable inferences consistent with the complaint in favor of [Plaintiff]." *Quantum Color Graphics*, 185 F. Supp. 2d at 904. Resolving the factual dispute and drawing reasonable inferences in Plaintiff's favor, the Court holds that Plaintiff has satisfied its obligation to make a *prima facie* case of personal jurisdiction over Youngdahl. Similarly, given the manner

20

in which the parties have framed the issues, the Court holds that venue with respect to Youngdahl is proper in the Northern District of Illinois as well.

VII.    Motions to Dismiss

        A.    Standard

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted." *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). When considering the motion, the Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences from the facts in favor of the plaintiff. *See Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993). Dismissal for failure to state a claim is not appropriate unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

        B.    The Court Denies the Defendants' Motions to Dismiss the CEA Counts

                1.    The Court Cannot Determine Whether Plaintiff's CEA Claims Are Barred by the Statute of Limitations at This Stage of the Litigation

Defendants argue that Plaintiff's CEA claims are barred by the statute of limitations. Plaintiff filed this suit on March 10, 2004. (D.E. 1.) Defendants contend that the statute of limitations began to run on October 31, 2001, the date Plaintiff was allegedly required to cover its short positions in 30-year Treasury Options at inflated prices. (*See, e.g.*, D.E. 32 at 5; D.E. 37 at 2.) In contrast, Plaintiff argues that the statute of limitations began to run when Plaintiff acquired actual or constructive knowledge of a defendant's misconduct. (D.E. 47 at 7.) Plaintiff also contends that, because of factual disputes concerning the limitations issue, it is improper to

resolve Defendants' limitations defense by way of a motion to dismiss. (*See, e.g., id.* at 6.)

The Defendants further argue that even if the limitation period did not begin to run on October 31, 2001, as result of various news articles, Plaintiff at a minimum was put on "inquiry notice" of its CEA claims in November 2001. (*See* D.E. 32 at 6; D.E. 37 at 2.) Plaintiff responds that "[a]t best, the facts disclosed in November 2001 may have aroused some suspicion that Goldman Sachs received information with which it could manipulate the Treasury markets." (D.E. 47 at 7.) According to Plaintiff, "the reported facts did not convey the nature and extent [of] Defendants' transactions in Treasury Bonds, Futures or Options and hence did not provide a sufficient factual predicate for 'inquiry notice.'" (*Id.*) Plaintiff further alleges in its complaint that "the truth surrounding [the Defendants'] misconduct did not emerge until September 4, 2003, when the Securities and Exchange Commission publicly disclosed the results of its investigation against Defendants." (Compl. ¶ 2; *see also* D.E. 47 at 8.) Plaintiff also contends that if even media reports prior to September 4, 2003, could have put it on inquiry notice, it would not have received such notice earlier than March 29, 2002, when the SEC announced "even the mere possibility of charging Goldman Sachs or Youngdahl with fraud." (D.E. 47 at 7.) Goldman Sachs replies that Plaintiff "does not identify a single fact relevant to Plaintiff's claim[s] that was first disclosed in the SEC's insider trading allegations, or otherwise not part of the public record prior to March 2002." (D.E. 69 at 4.)

A claim under the CEA must be "brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c); *accord Stephan v. Goldinger*, 325 F.3d 874, 876 (7th Cir. 2003). "[T]he statute commences to run when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." *Dyer v. Merrill Lynch, Pierce,*

22

*Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991) (collecting cases). In this regard, "[t]he proper standard for determining the commencement of the limitations period is when the plaintiff knew or in the exercise of reasonable diligence should have known of [the] defendant's alleged misconduct." *Id.*; *accord, e.g.*, *Rotter v. Leahy*, 93 F. Supp. 2d 487, 500 (S.D.N.Y. 2000); *McCarthy v. PaineWebber, Inc.*, 618 F. Supp. 933, 937 (N.D. Ill. 1985).

The Seventh Circuit has instructed, in the context of securities fraud claims, that "because the question of whether a plaintiff had sufficient facts to place it on inquiry notice of a claim . . . is one of fact, it may be 'inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 669 (7th Cir. 1998) (quoting *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997)). The Seventh Circuit has also instructed, however, that "if a 'plaintiff pleads facts that show its suit [is] barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis.'" *Id.* at 670 (quoting *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995)). With these teachings in mind, the Court turns to Defendants' statute of limitations arguments.

Defendants' reliance on the date Plaintiff incurred its trading losses (*i.e.*, October 31, 2001) for purposes of triggering the limitations period is misplaced. There is no indication that Plaintiff had actual or constructive knowledge of Defendants' alleged misconduct on October 31, 2001. That is the touchstone. While Defendants cite cases in which inquiry or actual notice coincided with the date that losses actually were incurred, those cases involved different types of factual settings where, as Plaintiff points out, the "plaintiffs were customers of the defendant brokers and knew the precise transactions at issue, the nature of [the] defendants' misconduct, and [the] exact reasons for their losses more than two years before bringing suit." (D.E. 47 at 8.)

23

In this case, by way of contrast, Plaintiff does not allege that there was an investment relationship between Plaintiff and Defendants. (To the contrary, Plaintiff and Defendants did not even transact in the same financial instruments or securities.) It is undisputed that Plaintiff did not learn of Goldman Sachs's alleged insider trading until some point after Plaintiff covered its short positions in the options market. Thus, the statute of limitations, on the facts of this case, did not begin to run immediately when Plaintiff incurred its losses.

Defendants also argue that, as a result of various news articles, Plaintiff was, at a minimum, put on "inquiry notice" of its CEA claims in November 2001. The cases, however, that Defendants cite in support of their "inquiry notice" argument are not persuasive, at least at this stage of the proceedings, as to the November 2001 date. For instance, Defendants cite *Southwire Co. v. J.P. Morgan Chase & Co.*, 307 F. Supp. 2d 1046, 1055-1058 (W.D. Wis. 2004), for the proposition that "broad disclosure [in the media] of the SEC investigation into Goldman Sachs'[s] trading is alone sufficient to have placed Plaintiff on notice of its claims." (D.E. 32 at 6.) Assuming for present purposes at least that this assertion is correct as a matter of law, it appears, based on Plaintiff's arguments, that one can reasonably contend at this stage that information regarding a potential SEC investigation of Goldman Sachs did not appear in the media until the end of March 2002. (D.E. 47 at 4; *see also id.*, Ex.3.) Plaintiff filed suit in the beginning of March 2004. (D.E. 1.) If Plaintiff's view of the evidence is correct, then Plaintiff's CEA claims would have been filed within two years of its receipt of inquiry notice.

In sum, this case appears to fall into the general category identified by the Seventh Circuit where inquiry notice issues cannot be resolved at the motion to dismiss stage. As Plaintiff explains, Defendants' "date of loss" approach seems to be incorrect on the facts of this case.

24

Defendants' "news in the public domain" approach may (or may not) be meritorious, but that issue cannot fairly be resolved at this stage of the proceedings.

> 2. The Complaint Provides Defendants with Sufficient Notice of a Market Manipulation Claim Under the CEA

Defendants launch a broad attack on the sufficiency of Plaintiff's CEA allegations, arguing that Plaintiff has failed to plead a number of the elements of a market manipulation claim. (D.E. 32 at 6.; D.E. 37 at 4.) Goldman Sachs also argues that Plaintiff has failed to comply with Federal Rule of Civil Procedure 9(b) (D.E. 32 at 7), which requires, among other things, that "all averments of fraud or mistake . . . be stated with particularity." Fed. R. Civ. P. 9(b).

The parties apparently agree that elements of a manipulation claim under Section 9 of the CEA, 7 U.S.C. § 13(a)(2), at least generally speaking, in this Circuit include the following: "(1) the defendant was able to influence prices; (2) an artificial price existed; (3) the artificial price was caused by the defendant; and (4) the defendant specifically intended to cause the artificial price." (D.E. 47 at 9-10 (citing *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995)).) Plaintiff contends, however, that these elements "may be 'modified to fit the specific facts of a particular case.'" (*Id.* at 10 (quoting *Soybean Futures*, 892 F. Supp. at 1045).)

The Court need not address the specific elements of such a claim at this stage of the litigation. In this regard, Defendants do not argue that they do not have notice of the interrelated CEA claims against them. Indeed, Plaintiff's theory (whether valid or not) is relatively unadorned. Precedent teaches that Defendants' further attacks to the adequacy of the CEA claims are best addressed, given that Defendants have clear notice of the claims, at the summary

judgment stage. *See In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 508-509 (S.D.N.Y. 2004) (holding in a case where the plaintiffs asserted a claim under Section 9(a), 7 U.S.C. § 13(a)), that "[d]efendants' arguments that [p]laintiffs' theory of causation is inadequate, that their allegation of specific intent is insufficient, or that their assertion of artificial prices is inept, are more properly made in a motion for summary judgment rather than a motion to dismiss").

Goldman Sachs also contends that the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) applies to Plaintiff's CEA claims. In this regard, Goldman Sachs cites *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), for the proposition that "[a]lthough states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail." (D.E. 32 at 7.) The Court notes that Plaintiff has not addressed this argument and Goldman Sachs has not cited a case where Federal Rule of Civil Procedure 9(b) was applied to a claim for manipulation under Section 9 of the CEA, 7 U.S.C. § 13(a)(2).

Federal Rule of Civil Procedure 9(b) creates a heightened pleading standard for "averments of fraud or mistake," but also explains that "intent . . . may be averred generally." Fed. R. Civ. P. 9(b). One district court recently noted that "it appear[ed] that no court ha[d] required a plaintiff to plead a claim for manipulation under CEA § 9(a) with the same particularity that [Federal Rule of Civil Procedure] 9(b) requires of claims charging fraud." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d at 509. That same court later applied the Rule 9(b) pleading requirement to a manipulation claim under Section 9 of the CEA after holding that the manipulative scheme alleged by the plaintiffs "sound[ed] in fraud." *In re Natural Gas Commodity Litig.*, No. 03-6186, 2005 WL 447419, at *4 (S.D.N.Y. Feb. 25, 2005). The

26

defendant at issue in that case was alleged to have manipulated the natural gas market through false reporting of trade data to industry publications. *Id.*, at *1.

The instant manipulation claim is not premised on allegations of fraud: Defendants are not alleged to have made any statements (false or otherwise) in connection with the alleged market manipulation. Although the Court does not purport to endorse a rule that Rule 9(b) pleading requirements *never* could apply to a CEA manipulation claim, the facts of this particular case do not appear consistent with the imposition of such requirements. The Court declines, particularly in light of Defendants' failure to cite any case supporting imposition of such a requirement, to require Plaintiff to plead its case consistent with the strictures of Federal Rule of Civil Procedure 9(b), as Plaintiff's claims under Section 9 of the CEA do not sound in fraud.[7]

      C.      The Antitrust Claims Are Dismissed Without Prejudice

The antitrust claims in this case, like all of the claims, are predicated on the allegations that the Defendants (Goldman Sachs and its employees, in one setting, and MFS and its employees in another), during an eight-minute period on October 31, 2001, traded 30-Year Treasury Bonds on the basis of "material[,] non public information." (Compl. ¶ 49; *see also id.* ¶¶ 48, 54.) Goldman Sachs is also alleged to have traded in Treasury Futures. (*Id.* ¶ 60.) No Defendant is alleged to have traded in options, the market where Plaintiff allegedly was affected.

---

[7]      MFS argues that Plaintiff's CEA claim is barred by the Treasury Amendment, 7 U.S.C. § 2. Plaintiff contends that even if such an argument were meritorious, it "normally must be pled as an affirmative defense." *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1043 n.18 (S.D.N.Y. 1993). Given the lack of particularly relevant authority on this issue identified in the parties' briefs and that there appears to be a meaningful dispute over the applicability of the Treasury Amendment here, the Court declines to decide this issue in the context of the instant motions to dismiss. The parties are free to reraise this issue as suggested in *Three Crown Limited Partnership. Id.*

(Plaintiff is not alleged to have traded in any of the markets in which the Defendants conducted the alleged insider trading, and Plaintiff also does not allege that it traded in any market contemporaneously with Defendants' alleged insider trading.)

According to the Complaint, during the eighteen minute window on October 31, 2001, immediately before public disclosure of the inside information (a period encompassing the period of Defendants' alleged insider trading), the market price of Treasury Bonds and Treasury Futures upticked by less than 25 basis points, or some .15-.23%. (*Id.* ¶¶ 56-57.) At 9:43 a.m. on October 31, 2001, the information that underlay Defendants' alleged insider trading—namely, the Treasury Department's intent to suspend the issuance and sales of the 30-Year Treasury Bond (*id.* ¶ 61)—was disclosed to the public in an announcement posted on the Treasury Department's website. That announcement triggered "the largest one-day rally" in the 30-Year Treasury Bond market since 1987, which rally, Plaintiff acknowledges, "was caused by news of the Treasury's suspension of issuance and sales of the 30-Year Treasury Bond." (*Id.*) The rally in the wake of the announcement produced an approximately 6% rise in the price of the 30-Year Treasury Bond and, according to the Complaint, also "led to a flurry of activity on the markets for the 30-Year Treasury Futures and 30-Year Treasury Options." (*Id.*) After the Treasury Department Announcement and concomitant market movements, Plaintiff eventually bought Treasury Bond Options to cover short positions it had established some weeks earlier. (*Id.* ¶ 72.)

In this case, Plaintiff does not contend that it has standing under the law to bring any conventional claim for insider trading. As a result, it has endeavored to plead unorthodox claims under, among other statutes, Section 1 of the Sherman Act (in conjunction with Section 4 of the Clayton Act). Defendants have advanced a variety of attacks against the two antitrust claims

(Count VII, as to Goldman, its employee, Youngdahl, and Davis; and Count VIII, as to MFS, its employee, Nothern, and Davis). The Court will principally address only one of Defendants' arguments here, as it warrants dismissal of the antitrust claims.

In *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401 (7th Cir. 2002), the Seventh Circuit instructed that a district court should be wary of dismissing antitrust complaints under Rule 12(b)(6). *Id.* at 404. Nonetheless, *42nd Parallel North*, which affirmed a dismissal of an antitrust claim on the pleadings, also taught that "'[i]n considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality.'" *Id.* at 406 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984)). Economic reality and commonsense militate strongly in favor of dismissal without prejudice here. *Accord 42nd Parallel North*, 286 F.3d at 404; *Cathedral Trading, LLC v. Chicago Bd. Options Exch.*, 199 F. Supp. 2d 851, 860 (N.D. Ill. 2002) (dismissing Section 1 Sherman Act claim under Fed. R. Civ. P. 12(b)(6)).

Plaintiff has elected to advance claims under Section 1 of the Sherman Act, which proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy" in restraint of trade. 15 U.S.C. § 1. Defendants contend, and Plaintiff does not dispute, that Plaintiff's Section 1 claims, like most Section 1 claims, are subject to what is known as the Rule of Reason analysis. (D.E. 32 at 15.) The Seventh Circuit has repeatedly taught that "[a] threshold inquiry in any Rule of Reason case is whether the defendant had market power . . . ." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987); *accord 42nd Parallel North*, 286 F.3d at 405 (discussing "threshold requirement" of a showing of "market power"). To establish market power, a plaintiff must be able to show that the defendants had the

29

ability to adversely affect competition through ownership or control of "a substantial percentage of the sales in a market carefully defined in terms of both product and geography." *Valley Liquors*, 822 F.2d at 666. In *Valley Liquors*, the Seventh Circuit further instructed that "a 20-25% market share or less does not constitute market power." *Id.*

In this case, even reading all allegations in the Complaint generously, there is no reasonable basis to discern how the Defendants' alleged insider trading, which began and ended in a fleeting window of less than ten minutes' time, constituted an exercise of cognizable market power, within a defined and definable market, on the facts pleaded.

In this regard, Congress has specifically recognized that the Treasury Bond market is "one of the largest and most liquid securities market in the world." S. Rep. No. 103-109, at 7 (1993). Congress has also recognized that "[t]here are more than $2.75 trillion in marketable Treasury debt securities outstanding." (*Id.*) Defendants reasonably assert, and Plaintiff does not attempt to challenge or even question, that the average *daily* trading volume in the Treasury Bond market in 2001 was approximately *$300 billion dollars.* (*See* D.E. 37 at 7.[8]) Thus, even if Defendants engaged in the alleged insider trading in Treasury Bonds, it appears that their $149 million in alleged trades (*see* Compl. ¶¶ 48, 54 ($65 million as to MFS, and $84 million as to Goldman Sachs)) constituted a near infinitesimal fraction (perhaps less than .05%) of the average daily trading volume in this arena. This trading volume also, incidentally, is substantially below the $2 billion threshold that the Treasury Department has deemed sufficiently large to trigger a mere

---

[8]     Defendants assert, and Plaintiff does not dispute, that "[p]ublicly available and objective market data (such as historic prices and trading volume) are properly considered by the Court on a motion to dismiss and do not convert the motion to one for summary judgment under Rule 56." (D.E. 37 at 7 (citing *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002).)

reporting requirement, which itself creates "no presumption of manipulative or illegal intent." Government Securities Act Regulations: Large Position Rules, 61 Fed. Reg. 48,338, 48,339 (Sept. 12, 1996) (discussing reporting requirements for certain Treasury securities, including the 30-Year Bond); *accord* Dep't of Treasury Large Position Reporting Rules, 17 C.F.R. § 420.2.

Under such circumstances, even crediting all of Plaintiff's factual averments and reasonable inferences therefrom, it does not appear, at least as the case is presently alleged, that Plaintiff can meet its basic threshold requirement of showing cognizable market power within any defined economic market. Plaintiff will be given an opportunity to replead to address this issue, if it so chooses. At this juncture, however, the present averments appear to be clearly insufficient to state a cognizable claim. *Accord, e.g., 42nd Street Parallel*, 286 F.3d at 405 (affirming dismissal under Rule 12(b)(6) and stating that "this circuit has adopted a threshold requirement . . . that the plaintiff needs to show that the defendant has market power"); *Cathedral Trading*, 199 F. Supp. 2d at 860 (dismissing Section 1 Sherman Act complaint under Rule 12(b)(6), where allegations did not reflect that defendants had any market power, because "substantial market power is an essential ingredient of every antitrust case under the Rule of Reason") (internal citation and quotation omitted).

In addition, although the Court need not rule on this issue, at least at the present time, it appears that Plaintiff might well independently fail in any Section 1 claim for lack of antitrust standing. For Plaintiff to properly plead its antitrust claims, it "is required to show that it has 'antitrust standing,' i.e., that its claimed injuries 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'" *Midwest Gas Servs., Inc. v. Ind. Gas Co., Inc.*, 317 F.3d 703, 710 (7th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-*

*O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). When evaluating antitrust standing, courts look to the following nonexhaustive list of factors: "(1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment." *Sanner v. Bd. of Trade of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995).

The Court need not rule on this issue now, but the last three of these factors, at least, would appear to cut against Plaintiff. Plaintiff concedes that the market shift leading directly up to the time it covered its positions was the product of substantial trading in the wake of the Treasury Department's public announcement—trading of sufficient intensity that the price in the 30-Year Bond market shifted in a geometrically larger manner (*i.e.*, by some 6% (*see* Complaint ¶ 61)), as opposed to by some .15% to .23% (*id.* ¶¶ 56-57)) than it did during the period encompassing Defendants' allegedly tainted trades. As a result, assessment of damages and apportionment of any damages also, at least arguably, would be speculative. This problem appears to be exacerbated by Plaintiff's proposed class definition, which would encompass "[a]ll individuals and entities who held short positions in 30-Year Treasury Futures or 30-Year Treasury Options as of 9:25 a.m. (EST) on October 31, 2001[,] and who covered such positions *at any time thereafter*." (*Id.* ¶ 1 (emphasis added).) Any problems about the speculative nature of proving damages and causation as to entities who covered short positions on October 31, 2001, would appear to be substantially magnified as to putative plaintiffs who covered their positions days, weeks, or months (and literally likely trillions of dollars in trades, variously

32

affected by any number of market forces) after the Defendants' $150 million in alleged illicit business and the public release of any alleged inside information. In addition, the first factor identified above—causal connection—also would appear to create meaningful questions about whether Plaintiff could show a cognizable nexus between any alleged wrongdoing of Defendants and losses later incurred by Plaintiff. Again, this problem would appear to be heightened for any putative class member who later traded at a remote point of time after holding for a (perhaps substantial) period beyond October 31, 2001.

For the present, however, the Court need not rule on the antitrust standing question. For the reasons explained above, Plaintiff's antitrust claims are dismissed without prejudice.

D.      Plaintiff's State Law Claims are Dismissed

Plaintiff's state law claims are, as explained below, dismissed because they are preempted under the Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 77p and 78bb(f). In addition, Plaintiff's claim under the Illinois Consumer Fraud Act is dismissed as substantively defective.

1.      Plaintiff's State Law Claims Are Preempted

Plaintiff's state law claims under the Illinois Consumer Fraud Act ("ICFA") (Count IV) and the Illinois common law of conspiracy (Counts V and VI) are barred by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 77p and 78bb(f). Under SLUSA, "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party" who alleges that the defendants "used or employed any manipulative or deceptive device . . . in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p and 78bb(f)(1); *accord, e.g., Ray v. Citigroup*

*Global Mkts., Inc.*, No. 03-3157, 2003 WL 22757761, at *6 (N.D. Ill. Nov. 20, 2003) (dismissing Illinois common law claims as SLUSA-preempted); *Rowinski v. Salomon Smith Barney, Inc.*, No. 02-2014, 2003 WL 22740976, at *3 (M.D. Pa. Nov. 20, 2003) (dismissing claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law and common law as SLUSA-preempted). "Once the requirements of the SLUSA are met, the statute precludes all state law causes of action." *Id.*, at *4.

Plaintiff's state law claims fall within the textual scope of the SLUSA preemption provision and thus are subject to preemption; in addition, preemption in this case is consistent with the legislative history to SLUSA. *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001). As a result, Plaintiff's state law claims are preempted and must be dismissed. *See, e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (plain meaning of statute presumptively controls); *Cent. States, S.E. and S.W. Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir. 1994) (same).

Plaintiff contends that preemption does not apply because its alleged losses occurred when it bought Treasury Options as opposed to Treasury Bonds—or, put differently, that Plaintiff is suing to recover losses stemming from financial instruments (*i.e.*, options) that are not themselves "securities." The Court respectfully disagrees with Plaintiff, as Plaintiff does not ask the relevant statutory question. SLUSA calls for preemption of putative state law class actions that allege, as relevant for present purposes, misconduct by the defendants "in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). There is no requirement that Plaintiff itself must trade in securities. Precedent teaches that the "in connection with" language in the securities context is not to be interpreted restrictively. *See SEC v. Zandford*, 535 U.S. 813,

821 (2002) (quoting *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)). In this case, Plaintiff alleges more than misconduct coinciding with a securities transaction; instead, Plaintiff alleges that various Defendants traded government securities on the basis of "material[,] non-public information" in violation of the "federal securities laws." (Compl. ¶ 109; *accord, e.g., id.* ¶¶ 101-102, 105; *see also Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1341 (11th Cir. 2002) (explaining that SLUSA preemption provision was enacted to close perceived loophole that allowed putative plaintiffs to "circumvent the restrictions placed on securities claims in federal court").) In this regard, it is worth noting Section 10(b) of the Exchange Act specifically addresses trading on the basis of "material, non public information"—*see generally Dirks v. SEC*, 463 U.S. 646, 654 (1983)—which is what Plaintiff alleges was the genesis and foundation of its harm here. (Compl. ¶ 109.) A class's state law challenge to this type of alleged misconduct is specifically what was intended to be preempted by SLUSA. *See Lander*, 251 F.3d at 108 (affirming dismissal of various state law common law and statutory claims under SLUSA, including a claim under the Connecticut Unfair Trade Practices Act).

Plaintiff cannot defeat the prohibition of SLUSA by stating that it is not "attempt[ing] to dress a Section 10(b) or Rule 10b-5 claim as a state law claim." (D.E. 45 at 4.) Plaintiff's suit is fundamentally premised on alleged insider trading of securities; that contention is at the very heart of Plaintiff's suit. Plaintiff cannot avoid SLUSA preemption by bringing its Illinois claims, which effectively incorporate the securities claim within them, under state law theories. *See Feitelberg v. Merrill Lynch & Co., Inc.*, 234 F. Supp. 2d 1043, 1048 (N.D. Cal. 2002) ("SLUSA requires that the court look beyond the face of plaintiff's pleadings . . . ."), *aff'd*, 353 F.3d 765

(9th Cir. 2003); *accord, e.g.*, *Behlen v. Merrill Lynch*, 311 F.3d 1087, 1093-94 (11th Cir. 2002)

(dismissing state law claims, such as unjust enrichment and negligence, as SLUSA-preempted).

2.  The Illinois Consumer Fraud Act Claim Is Also Substantively Defective

   a.  The ICFA Claim Fails Because Plaintiff Does Not Allege That
       Defendants Employed a Deceptive Act or Practice "In the Course
       of Conduct Involving Trade or Commerce" Under the ICFA

One of the elements of an ICFA claim is that the defendants must have employed a

deceptive act or practice "in the course of conduct involving trade or commerce." *Oliveira v.

Amoco Oil Co.*, 776 N.E. 2d 151, 160 (Ill. 2002) (collecting cases); *see also* 815 ILCS 505/2

(requiring that any alleged deceptive conduct take place "in the conduct of any trade or

commerce."). Section 1 of the ICFA collectively defines the terms "trade" and "commerce" as:

> the advertising, offering for sale, sale, or distribution of any services and
> any property, tangible or intangible, real, personal or mixed, and any other
> article, commodity, or thing of value wherever situated, and shall include
> any trade or commerce directly or indirectly affecting the people of this
> State.

815 ILCS 505/1. Where challenged conduct or practices were not committed in the course of

trade or commerce, an ICFA claim is defective as a matter of law and must be dismissed. *See

Cont'l Assurance Co. v. Commonwealth Edison Co.*, 551 N.E.2d 1054, 1059 (Ill. App. Ct. 1990)

(dismissing ICFA claim because false statements by corporation to shareholders regarding stock

redemption did not satisfy trade or commerce element); *see also Lynch Ford, Inc. v. Ford Motor

Co.*, 957 F. Supp. 142, 148 (N.D. Ill. 1997) (dismissing ICFA claim for failure to allege

deceptive act in the course of trade or commerce).

Here, Plaintiff does not allege that any of the Defendants acted in the course of any "trade

or commerce" as defined by the ICFA. Plaintiff merely alleges that, at most, the Defendants

36

unfairly purchased Treasury Bonds and Futures based on non-public information. Because

Plaintiff does not allege any deceptive conduct by the Defendants in the course of the advertising,

offering for sale, sale or distribution of any product, Plaintiff's ICFA claim is defective at law.

*See Cont'l Assurance Co.*, 551 N.E.2d at 1059; *see also Lynch Ford*, 957 F. Supp. at 148.[9]

        b.     Plaintiff Cannot Satisfy Legal Causation as Required by the ICFA

Under the ICFA, Plaintiff must be able to prove that the Defendants' alleged deceptive

conduct directly or proximately caused Plaintiff's injury. *See Oliveira*, 776 N.E. 2d at 155

("Proximate causation was a necessary element of plaintiff's complaint . . . ."). Plaintiff cannot

make this showing under Illinois law under the facts alleged.

Recent teaching from the Illinois Supreme Court establishes that Plaintiff's alleged harm

is too attenuated from Defendants' alleged wrongful conduct to state a cognizable claim under

the ICFA. In *Oliveira*, the plaintiff bought gasoline that he claimed was artificially expensive

because of misleading advertisements run by the defendant. *Id.* at 154. The Illinois Supreme

---

[9]     Plaintiff proposes that it can satisfy the "trade or commerce" prong of the ICFA because, when Defendants engaged in their alleged insider trading, a "'sale' of Treasury Bonds and Futures took place." (D.E. 47 at 14.) Illinois precedent, however, rejects this sort of roundabout look at whether a relevant sale has occurred. The earlier sales of Treasury Bonds, in which the Plaintiff was not involved, are not germane. Other parties were the buyers and sellers in those transactions, and none of them, as a putative "consumer," is "seeking the Act's protection." *Cont'l Assurance Co. v. Commonwealth Edison Co.*, 551 N.E.2d 1054, 1059 (Ill. App. Ct. 1990). Plaintiff also claims that the Defendants' "trade or commerce" argument ignores the fact that Plaintiff's ICFA claims are based on its purchases of Treasury Futures and Options "at prices that were artificially inflated by as a result of [sic] Defendants' unfair and deceptive acts and practices in connection with transactions involving the sale of Treasury Bonds." (D.E. 47 at 14.) This point also is unpersuasive. Defendants' alleged misconduct was completed before Plaintiff's purchases of other products, so any such misconduct was not committed in the course of Plaintiff's purchases. In addition, as explained at length immediately below, Plaintiff's attempt to invoke a "fraud on the market" theory under the ICFA is inconsistent with recent teaching of the Illinois Supreme Court in *Oliveira v. Amoco Oil Co.*, 776 N.E. 2d 151 (Ill. 2002).

Court found that the plaintiff failed to allege the requisite proximate causation. *Id.* at 140-41 & n.1, 154-55. The plaintiff so failed because he never saw the allegedly deceptive advertisements that were claimed to inflate the demand for certain gasoline and to inflate artificially its price, and the plaintiff also did not allege that he "received anything other than what he expected to receive when he purchased defendant's gasoline, *i.e.*, a certain amount of gasoline . . . for the price listed on the pump." *Id.* at 154.

In the case *sub judice*, Plaintiff similarly contends that it was unaware of the Defendants' alleged insider trading (that is the basis for Plaintiff's response to the statute of limitations arguments that Defendants variously advance); Plaintiff also does not allege that it received anything other than what it expected—specifically, a certain number of Treasury Bond Options for a stated price. Under *Oliveira*, that is not sufficient. *Id.* at 140-41 & n.1, 154-55.

Plaintiff contends that *Oliveira* should not apply, because "[i]n the commodities markets, a market participant such as Plaintiff can rely on the integrity of the market prices and their freedom from price manipulation." (D.E. 47 at 14 (citing *Minepco, S.A. v. Hunt*, 718 F. Supp. 168, 177 (S.D.N.Y. 1989).) This argument is not persuasive. *Minepco*, Plaintiff's proffered case, says nothing about the ICFA, as that case does not even involve claims under the ICFA statute. Moreover, the basis of Illinois Supreme Court's *Oliveira* decision was that the plaintiff's "market inflation" theory—which *Oliveira* specifically analogized to the "fraud on the market" theory that Plaintiff would purport to invoke here (*see id.*, 776 N.E. 2d at 155 n.1)—was insufficient to found proximate cause under the ICFA. Plaintiff cites no case where the ICFA ever was used to advance a "fraud on the market" theory, and *Oliveira* cuts strongly against Plaintiff's claim here. Plaintiff offers no explanation as to why the required proximate causation

element for an ICFA claim is any less important in a claim to recover losses allegedly sustained in a commodities market, as opposed to a securities or any other presumptively competitive and efficient market. In the absence of any further guidance from the Illinois Supreme Court, the Court finds that the teaching of *Oliveira* controls.[10]

Accordingly, Plaintiff's state law claims against Defendants are preempted and dismissed for the reasons explained above.

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are denied in part and granted in part. Defendant Youngdahl's motion to dismiss for lack of personal jurisdiction and/or venue (D.E. 50) is denied. Defendant Nothern's motion to dismiss for lack of jurisdiction and/or venue (D.E. 35) is granted. Defendants' various motions to dismiss under Rule 12(b)(6) (D.E. 32, 36-37, 49) are granted in part and denied in part. The motions to dismiss the CEA claims are denied. The antitrust claims are dismissed without prejudice. The state law claims are all dismissed.

So Ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Dated: March 28, 2005

---

[10]    Defendants also contend that the state law conspiracy claims are defective because a corporation such as MFS or Goldman Sachs cannot conspire with its employees and agents. Plaintiff appears to acknowledge that neither MFS nor Goldman Sachs could conspire with its employee (Nothern and Youngdahl, respectively). Given the Court's other rulings, the Court need not pass on Defendants' arguments at this juncture. The arguments arguably implicate factual issues, at least as to Davis, that might make the issue inappropriate for resolution at the motion to dismiss stage.