# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PREMIUM PLUS PARTNERS, L.P., )
)
          **Plaintiff,** )
)
          v. )     No. 04 C 1851
)
PETER J. DAVIS, JR., et al., )
)
          **Defendants.** )

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Goldman Sachs & Company's (Goldman) renewed motion for summary judgment and on the parties' motions to strike. For the reasons stated below, we deny the renewed motion for summary judgment and grant in part and deny in part the motions to strike.

## BACKGROUND

Plaintiff Premium Partners, L.P. (Premium) alleges that it held substantial short positions in 30-Year Treasury Options at 9:25 a.m. on October 31, 2001. Premium contends that Goldman and Defendant Massachusetts Financial Services Company (MFS) paid Defendant Peter J. Davis (Davis) to funnel to them nonpublic information that Davis discovered at a confidential United States Department of

Treasury (Treasury Department) quarterly refunding meeting (Meeting), including a conference that took place between 9:00 a.m. and 9:25 a.m. on October 31, 2001. Davis allegedly learned during the Meeting that the Treasury Department would suspend the 30-Year Treasury Bond. Premium contends that when the information was released, the demand for 30-Year Treasury Bonds increased and, in turn, the costs increased for investors that had to cover short positions in 30-Year Treasury Futures and 30-Year Treasury Bond Options.

According to Premium, after the Meeting at 9:35 a.m., Davis called Defendant John M. Youngdahl (Youngdahl), who worked for Goldman, and at approximately 9:38 a.m. Davis called Defendant Steven E. Northern (Northern), who worked for MFS. Davis allegedly informed Youngdahl and Northern that the Treasury Department was going to suspend the 30-Year Treasury Bond. Goldman then allegedly immediately purchased $84 million in 30-Year Treasury Bonds and significant amounts of 30-Year Treasury Futures. MFS also allegedly immediately purchased $65 million in 30-Year Treasury Bonds before public disclosures. At 9:43 a.m. on October 31, 2001, a Treasury announcement was posted as a press release on the Treasury website and there was a formal announcement reported by Reuters at 9:57 a.m., Premium claims that Defendants manipulated the 30-Year Treasury Bond market, artificially influencing the price of 30-Year Treasury Bonds, Futures, and Options. Premium contends that Defendants' manipulation in turn required investors such as Premium to pay additional costs to cover short positions in 30-Year Treasury Futures and Options.

Premium includes in its complaint Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, claims brought against Goldman and Youngdahl (Count I), CEA claims brought against MFS and Northern (Count II), a CEA claim brought against Davis (Count III), Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, claims brought against all Defendants (Count IV), civil conspiracy claims brought against Goldman, Youngdahl, and Davis (Count V), civil conspiracy claims brought against MFS, Northern, and Davis (Count VI), Sherman Antitrust Act claims brought against Goldman, Youngdahl, and Davis (Count VII), and Sherman Antitrust Act claims brought against MFS, Northern, and Davis (Count VIII).

The prior judge in this case granted in part and denied in part Defendants' motions to dismiss, dismissing all claims brought against Northern, and all state law claims (Counts IV-VI). The prior judge also dismissed all Sherman Antitrust Act claims without prejudice. Premium then indicated that the only remaining claims that it was pursuing were the CEA claims brought against Youngdahl, Goldman, and MFS. (4/11/08 Mot. Reinst. 4). Goldman and MFS each moved for summary judgment on the remaining claims pending against them. Premium also filed a motion for leave to conduct additional discovery and motions to strike. On July 30, 2008, we granted MFS's motion for summary judgment in its entirety and we granted Goldman's motion for summary judgment to the extent that the CEA claim brought against Goldman is based on the trades of 30-Year Treasury Bonds. We denied without prejudice Goldman's motion for summary judgment to the extent that

the CEA claim is based upon alleged purchases of 30-Year Treasury Futures.  We also granted Premium's motion for leave to conduct appropriate discovery and denied without prejudice Premium's motions to strike.  Goldman has now filed a renewed motion for summary judgment and the parties have filed motions to strike.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case."  *Id.* at 325.  Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of

material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

### I. Goldman's Motion to Strike Reports and Testimony of Glen Donaldson

Goldman moves to strike the reports and testimony of Glen Donaldson (Donaldson), an expert hired by Premium for this case. Pursuant to Rule 702 and the analysis provided in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), in order for an expert opinion to be admissible: (1) "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education,'" (2) "the expert's reasoning or methodology underlying the testimony must be scientifically reliable," and (3) "the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)(quoting in part Fed. R. Evid. 702)(stating that the opinion must be "both relevant and reliable"). In assessing the reliability of an expert opinion, a court must consider factors such as "(1) whether the scientific theory can be or has been tested," "(2) whether the theory has been subjected to peer review and publication," and "(3)

whether the theory has been generally accepted in the scientific community." *Id.*; *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)(stating that an "expert's failure to make any adjustment for variables bearing on the decision" at issue and "his equating a simple statistical correlation to a causal relation . . . indicates a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation"); *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 111 F.3d 528, 537-38 (7th Cir. 1997)(stating that "[a] statistical study is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest," but "a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court"); *Sanner v. Board of Trade of City of Chicago*, 2001 WL 1155277, at *2-*6 (N.D. Ill. 2001)(noting that the parties agreed that statistical regression and event studies were accepted methods for market studies)(stating also that "[a]s the Seventh Circuit has stated more colorfully, '[t]he principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science'")(quoting in part *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)). *see also Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000)(stating "[t]hat two different experts reach opposing conclusions from the same information does not render their opinions inadmissible").

A.  Summary of Donaldson's Reports and Opinions

Donaldson indicates in his November 26, 2008 report (Donaldson's November 2008 Report) that he performed several studies to arrive at his conclusions. Donaldson explains that 30-Year Treasury Futures and 30-Year Treasury Options are derivative instruments, meaning that their values are tied to the price behavior of other underlying instruments.  (Don. Nov. R. 4).  Donaldson contends that an analysis of the price fluctuations of other instruments such as 30-Year Treasury Bonds and 30-Year Treasury Bond Repurchase Agreements is valuable to understanding fluctuations as to 30-Year Treasury Futures and 30-Year Treasury Options.  (Don. Nov. R. 4).  Donaldson also contends that an analysis of fluctuations in the prices of closely related instruments such as 10-Year and 5-Year Treasury instruments is valuable in understanding movements in the prices of 30-Year Treasury Futures and 30-Year Treasury Options.  (Don. Nov. R. 4).

1.  Cancellation/Suspension Comparative Studies

In Donaldson's November 2008 Report, Donaldson compares the price behavior of 30-Year Treasury Bonds around the time period of the cancellation with the price behavior of other treasury instruments around the time of their cancellation. (Don. Nov. R. 6).  Donaldson presents a chart to show that there was a significant rise and fall in the closing price of the 30-Year Treasury Bond around the period when the bond was cancelled on October 31, 2001.  (Don. Nov. R. 7).  Donaldson then presents other charts to show that there was not such a rise and fall for other

instruments during time periods when other instruments were cancelled or suspended, such as with the 3-Year Treasury Note that was suspended in 1998 and again in 2007, the 4-Year Treasury Note that was canceled in 1990, and the 7-Year Treasury Note that was cancelled in 1993. (Don. Nov. R. 7-8). Donaldson concludes that since there was no significant rise and fall in the prices for those other related instruments during the period around their cancellation or suspension, it "suggests that something *unusual* is likely occurring when, and for some time after, it was announced on October 31, 2001, that the 30-Year T-Bond would be cancelled." (Don. Nov. R. 9)(emphasis added).

### 2. Minute-by-Minute Analyses of October 31 Prices

Donaldson also presents minute-by-minute analyses of the closing prices for 30-Year Treasury Bonds and Futures on October 31, 2001. (Don. Nov. R. 10). Goldman allegedly obtained information concerning the cancellation of the 30-Year Treasury Bond at 9:35 a.m. on October 31, 2001. Donaldson presents a chart showing that starting at 8:00 a.m. on October 31, 2001, the price remained stable until 9:57 a.m. when the official full announcement of the cancellation was made. (Don. Nov. R. 10). The chart shows that the price gradually rose after 9:57 a.m. with the initial peak some time between 10:15 a.m. and 10:20 a.m., and then rose to a higher peak around 1:00 p.m. (Don. Nov. R. 10). Donaldson indicates that it cannot be presumed that the price rise was the result of the cancellation of the 30-Year Treasury Bond. (Don. Nov. R. 11). He contends that the bond market is not

instantaneously responsive to such announcements and that "even after the official public release, at 9:57 am, of the news that the 30-Year Treasury Bond would be cancelled, there could have still been private information left in the market that might or might not have been fully reflected in the price. . . ." (Don. Nov. R. 11).

Donaldson then presents charts showing the minute-by-minute prices for Treasury Call Options and 30-Year Treasury Put Options on the morning of October 31, 2001. Donaldson utilizes certain calculations to compare the price fluctuations during the 8-minute window between 9:35 a.m. and 9:43 a.m. (8-Minute Window) when Goldman allegedly possessed special information. (Don. Nov. R. 13). Donaldson also evaluates the 22-minute window between 9:35 a.m. and 9:57 a.m. Donaldson concludes that certain price movements were "unusual." (Don. Nov. R. 13-14). Donaldson concludes that "it is difficult to rule out the possibility that Goldman's behavior contributed to the upward move in market prices" and that, based on Goldman's percentage of the trading at the time, "it seems possible that Goldman's behavior may have had the effect of moving market prices for on-the-run 30-yr T-Bonds away from their 'normal' values." (Don. Nov. R. 14).

### 3. Event Study Tests - Regression Analyses

Donaldson also performed certain event study tests, using regression analyses to assess whether Goldman's trading during the 8-Minute Window affected prices. Donaldson presents certain charts to show that Goldman began purchasing sizable amounts of 30-Year Treasury Bonds and Futures positions starting at about 9:35 a.m.

(Don. Nov. R. 17-18).  Donaldson explains how he prepared a multiple regression model using a mathematical formula to assess whether price fluctuations were "abnormal."  (Don. Nov. R. 15, 20-22).  In the model, Donaldson assigned certain probability values to variables and he uses a "dummy variable" for what he deemed the effect at 9:57 a.m., when the official Treasury announcement was made (Announcement Variable).  (Don. Nov. R. 21).  Donaldson also uses a "dummy variable" for what Donaldson deems was the "effects of Goldman" during the "event window" (Goldman Variable).  (Don. Nov. R. 21).  Donaldson concludes after his calculations that the "Goldman Variable does indeed help explain 30-Year Treasury futures Prices."  (Don. Nov. R. 21).  Donaldson contends his finding is "robust." (Don. Nov. R. 25).  Finally, Donaldson presents some other models to show that Goldman's activities may have affected the prices in question.  (Don. Nov. R. 26-30).

4.  Donaldson's December 2008 Report

Donaldson also prepared a report dated December 16, 2008 (Donaldson's December 2008 Report).  In Donaldson's December 2008 Report he explains why he believes that the conclusions of Goldman's expert, Bradford Cornell (Cornell), are incorrect.  Donaldson contends that Cornell's conclusions are contrary to the data and are not based on proper formulas or procedures.  (Don. Dec. R. 2).  Donaldson goes into great detail explaining why he believes that Cornell did not apply the correct formulas and that Cornell's conclusions are not correct.  For example,

10

Donaldson contends that Cornell's statement that prices began to rise after 9:43 a.m. when Goldman was "either absent from the market or largely a net seller in the relevant securities," is contrary to Cornell's own data. (Don. Dec. R. 3). Donaldson contends that Cornell's data shows that Goldman was in fact a relevant buyer during that time period. (Don. Dec. R. 3-4). Donaldson also disagrees with Cornell's conclusion that Goldman was a small trader in the market, a conclusion that Cornell reached based on his findings that Goldman only traded approximately two thousand instruments during the 8-Minute Window, as compared to the more than half a million instruments traded on that same date of October 31, 2001. (Don. Dec. R. 6). Donaldson contends that the proper comparison should have been on the percentage of trades executed by Goldman during the 8-Minute Window causing price rises during that period and that it is not appropriate to compare Goldman's trades during the 8-Minute Window with the total trades that were made on the market during the entire day. (Don. Dec. R. 6). Donaldson contends that his calculations show that Goldman performed over ███ of the market trades "in the on-the-run 30yr Treasury Bond between 9:35am and 9:43am. . . ." (Don. Dec. R. 6). Donaldson also contends that Cornell improperly concludes that prices are mainly influenced by "widespread macroeconomic forces," such as the cancellation of the 30-Year Treasury Bond. (Don. Dec. R. 6). Donaldson argues that prices can be influenced by individual traders and cites to a study published in a financial journal to support his position. (Don. Dec. R. 7). Donaldson also contends that one article co-authored by Cornell himself recognizes that the "buying of stock by insider traders can push up stock

prices." (Don. Dec. R. 9). Donaldson also explains that he used the data from Cornell's November 2008 Report to make new calculations using Donaldson's formulas and that Donaldson's positions actually are stronger using Cornell's own data. (Don. Dec. R. 10). Donaldson also argues that Cornell improperly selected an alternative hypothesis for his hypothesis test and improperly used a "two-tailed test" for his hypothesis test. (Don. Dec. R. 16). Donaldson contends that Cornell should have used a "one tailed approach" for the hypothesis test. (Don. Dec. R. 176). Donaldson also argues that Cornell focused on the wrong data and "did not appropriately estimate the test statistics themselves. . . ." (Don. Dec. R. 16-23).

### B. Donaldson's Regression Analyses

Goldman argues that Donaldson's regression analyses are unreliable and biased and that the court should strike Donaldson's reports and testimony relating to such analyses.

### 1. Lack of Analysis of Options

Goldman contends that Donaldson's regression analyses are flawed since Donaldson did not evaluate 30-Year Options even though Premium's sole trading at issue in this case involved such options. Premium, however, points to Donaldson's explanation that an analysis of bonds and futures is instructive for this case since the prices of bonds and futures directly affected the options prices at issue in this case. (Ans. Str. Don. 17). Premium also asserts that Donaldson "analyzed the

specification contracts for 30yr CBOT options and futures and observed that the features of these contracts made it likely that any artificiality in the futures would be translated into the options." (Ans. Str. Don. 17)(Ans. Str. Don. 18 n. 13). Premium has provided sufficient justification for why Donaldson did not specifically analyze options. Thus, Goldman has not shown Donaldson's opinions and reports to be inadmissible simply because Donaldson did not specifically analyze options.


2.  Actual Trading Data

Goldman contends that Donaldson's regression analyses are also flawed because Donaldson did not use the actual trading data. Goldman argues that when such actual trading data is available there is no reason to construct dummy variables as Donaldson did. However, even if Goldman is correct that the use of the actual trading data would be a better way to analyze the prices, that does not necessarily mean that such is the only way to statistically analyze price fluctuations. It does not mean that regression analyses employing dummy variables, such as the methods utilized by Donaldson, can be of no assistance to the trier of fact. Premium, in fact, contends that the regression analyses Donaldson employed are standard in financial market cases and the industry, and that Donaldson used such analyses to find statistical significance in the price changes. (Ans. Str. Don. 9-10). Premium also points out how Donaldson, in forming his opinions, did take into consideration the trading summaries provided by Goldman. (Ans. Str. Don. 5). Goldman also takes issue with an academic source relied upon by Donaldson, contending that Donaldson

misread and distorted the source.  (Str. Don. 9 n.6).  Goldman can question Donaldson on cross examination at trial, if he testifies, about that academic source or Goldman could offer testimony by Goldman's own expert on that point.  However, a difference in opinions does not necessarily show that Donaldson's opinions are unreliable and inadmissible.  Thus, Goldman has not shown that Donaldson's opinions and reports are inadmissible due to the alleged fact that Donaldson failed to rely on actual trading data.

### 3.  Impact and Length of Impact

Goldman argues that Donaldson's regression analyses are also unreliable because the analyses fail to take into consideration how long it took Goldman's actions to impact the market and how long the impact lasted.  Goldman's arguments however, merely offer opinions as to how Donaldson's analyses could, in Goldman's opinion, have been better constructed.  Goldman has not shown that the analyses performed by Donaldson are inherently unreliable in light of such arguments.  As indicated above, while Goldman can attempt to rebut Donaldson's opinions at trial, the reasons advanced by Goldman do not provide a basis for striking Donaldson's opinions or reports.

### 4.  Formulation of Dummy Variables

Goldman argues that Donaldson's regression analyses also are unreliable and biased because Donaldson did not properly formulate the dummy variables.

Goldman offers extensive arguments why it would have formulated the variables differently, thus making for better regression analyses.  Goldman also contends that its own expert has found that Donaldson's dummy variables are improperly formulated.  Premium, in response, has offered ample justifications for Donaldson's determinations and Goldman has not shown that the dummy variables are so defined as to render Donaldson's regression analyses unreliable.  Goldman also argues that Donaldson's regression analyses are unreliable since they fail to "differentiate between the impact of the allegedly unlawful and lawful conduct."  (Str. Don. 14).  There remains genuinely disputed facts on this issue that should be considered by the trier of fact.  Therefore, as to the formulation of dummy variables, Goldman's motion to strike Donaldson's opinions is denied.

5.  One-Tail Test

Goldman argues that Donaldson's regression analyses also are unreliable because they employ a one-tail test.  Premium in turn offers justifications showing why, in Donaldson's opinion, the two-tail test proposed by Goldman would be inappropriate in this case and that the one-tail test is the proper method for the analyses.  (Ans. Str. Don. 21).  The difference of opinion by Goldman on this issue is not such that it shows that Donaldson's opinions or reports are unreliable and inadmissible.

Finally, even when considering all of the arguments by Goldman relating to Donaldson's regression analyses in their totality, Goldman has not shown the

analyses to be unreliable.  Goldman has merely shown the existence of a difference of opinion between the experts.  We also note that Goldman, in opposing the motion to strike its own expert, has recognized certain principles that would be applicable to Goldman's own motion to strike.  For example, Goldman, itself, in opposing Premium's motion to strike Goldman's expert, recognizes that a difference of opinion between the experts "is not a basis to exclude expert evidence. . . ."  (Ans. Str. Cor. 6); *Walker*, 208 F.3d at 589.  Goldman also acknowledges that such disagreements between experts are not an admissibility issue, but rather are matters that can be considered by the trier of fact when determining the weight that should be given to the expert opinions.  (Ans. Str. Cor. 6).  Goldman's motion to strike suffers from the same deficiency since Goldman's arguments relating to the regression analyses of Donaldson involve the weight to be given to the opinions, if any, which is for the trier of fact to consider.

Premium has shown that Donaldson's regression analyses could offer assistance to the trier of fact.  It will be for the trier of fact to determine what weight, if any, should be given to such analyses by Donaldson.  The regression analyses provide circumstantial evidence that can be introduced by Premium to support certain aspects of its case, such as artificiality and causation.  Therefore, we deny Goldman's motion to strike Donaldson's regression analyses.

### C.  Donaldson's Comparative Analyses

Goldman argues that Donaldson's comparative analyses are unreliable, will

16

not assist the trier of fact, and should be stricken.

  1.  Reliability of Comparative Analyses

Goldman contends that Donaldson's comparative analyses are unreliable. Goldman argues that Donaldson should have used a two-tail test rather than a one-tail test. However, Premium has offered sufficient justifications for the use of a one-tail test. Goldman also takes issue with certain words used by Donaldson to describe his findings such as "unusual," arguing that the language used by Donaldson is "tepid" and shows that Donaldson's opinions are mere speculation. (Str. Don. 24). We do not conclude that the word choices by Donaldson for his reports are such that they show his opinions to be unreliable or based on speculation. There are no magical words of confidence required under the law to render an expert's opinions admissible. Goldman also argues that Donaldson failed to specifically analyze options, but Premium has offered justifications for its choice to address other instruments.

Goldman also argues that the comparative analyses are unreliable since they compare vastly different securities during different time periods. We agree that Premium has not offered adequate explanation for this aspect of the comparative analyses performed by Donaldson. Donaldson argues that the cancellation on October 31, 2001, is not a unique event and that he justifiably compared the October 31, 2001 cancellation, to other cancellations by the Treasury Department. However, as Goldman explains, the 30-Year Treasury Bond is a unique instrument for a variety

of reasons. Donaldson has failed to provide an adequate explanation for his assertion that other instruments compared by him such as the 4-Year Treasury Note and 7-Year Treasury Note are sufficiently similar to the 30-Year Treasury instruments to offer a meaningful comparison. In addition, Donaldson fails to offer a sufficient explanation for discounting the fact that the cancellations that were compared occurred in distinctly different time periods. Donaldson has not pointed to any recognized form of statistical or scientific analysis that was the basis for his conclusions in his comparative analyses. *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005)(stating that "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable"). Donaldson fails, for example, to adequately explain why market conditions in 1990 and 1993 should be considered comparable to market conditions in October of 2001. In light of the differences between the types of instruments compared by Donaldson and the wide latitude of time periods compared by Donaldson, we cannot conclude, as the gatekeeper to the admission of such opinions, that such opinions are sufficiently reliable. Therefore, we grant Goldman's motion to strike Donaldson's opinions and reports relating to his comparative analyses.

### 2. Assistance to Trier of Fact

Goldman also argues that Donaldson's comparative analyses lack any scientific methodology behind them and offer no meaningful expert assistance to the

trier of fact. Goldman correctly points out that Donaldson's visual inspection of the charts he prepared are not backed up by recognized statistical analyses or other types of analyses that would be meaningful for the trier of fact. The trier of fact could visually inspect the charts prepared by Donaldson and form its own conclusions. *See Summers v. UAL Corp.*, 2005 WL 2648670, at *3 (N.D. Ill. 2005)(stating that "[t]he trier of fact is presumed to be able to think and reason on its own" and "[a]n expert is not employed in litigation to 'think' for the trier of fact" and that "an expert may only assist the trier of fact in its understanding of the facts and issues at hand"); *Sanner*, 2001 WL 1155277, at *7 (striking expert opinions that appeared to be the "result of guesswork and eyeballing-neither of which satisfy the dictates of *Daubert*"). We conclude for this reason also that Donaldson's comparative analyses are inadmissible. Donaldson has not put forth sufficient justification to testify as an expert in this regard. Therefore, we would also grant Goldman's motion to strike the expert reports and opinions relating to the comparative analyses prepared by Donaldson for the reasons explained above.

### D. Donaldson's Minute-by-Minute Analyses of October 31 Prices

Goldman argues that Donaldson's minute-by-minute analyses of trading on October 31, 2001, are unreliable. Goldman takes issue with the words used by Donaldson to describe his conclusions such as the word "unusual." However, as indicated above, the word choice by Donaldson for his conclusions is not such that it shows that his opinions should be inadmissible. Goldman also brings up its

difference of opinion concerning the use of the two-tail test instead of the one-tail test, but Goldman has not shown that the difference of opinion is such that Donaldson's opinions in the minute-by-minute analyses should be stricken. Goldman also again disagrees with Donaldson's decision not to specifically focus on options. However, Premium has provided sufficient justification for its choice of instruments with regard to its analyses and Premium has shown that the chosen instruments are such that they could have relevance in this case and offer meaningful assistance to the trier of fact. Donaldson has provided sufficient support for his statistical analyses underlying the minute-by-minute analyses to show that it should not be stricken. Thus, we deny Goldman's motion to strike Donaldson's opinion and reports regarding the minute-by-minute analyses.

## II.  Premium's Motion to Strike Reports and Testimony of Bradford Cornell

Premium moves to strike the reports and testimony of Cornell, an expert hired by Goldman for this case.

### A.  Summary of Cornell's Reports and Opinions

Cornell states in his November 26, 2008 report (Cornell's November 2008 Report) that he obtained trading data for his report from a number of public sources. He states that he was also provided with specific trading data by Goldman for October 31, 2001.  Cornell indicates that the market for Treasury notes, bills, and bonds is one of the largest and most liquid and efficient markets in the world.

### 1. Price Changes Prior to 10:00 a.m. for December 2001 Contracts

Cornell indicates that to determine whether the percentage price change of the December 2001 Contracts (the only one traded by Goldman on 10/31/01) between 9:35 a.m. and 9:43 a.m. was statistically significant, he "estimated the intra-day volatility of the Treasury Bond Futures in October and November 2001 to compute a t-statistic of the percentage price change." (Cor. Nov. R. 26). Cornell uses standard deviations and other statistical methods to make calculations. Based on his calculations, he concludes that the percentage price change between 9:35 a.m. and 9:43 a.m. is indistinguishable from the "random noise" of the market. (Cor. Nov. R. 27). Cornell then indicates that he made similar calculations for the period between 9:35 a.m. and 9:57 a.m. and for the period between 9:35 a.m. and 10:00 a.m. and concluded that the percentage price change between 9:35 a.m. and 9:57 a.m. was indistinguishable from the "random noise" of the market. (Cor. Nov. R. 27). Cornell also calculated the t-statistic for the percentage price change of the December 2001 Contract between 9:35 a.m. and 9:43 a.m. and between 9:35 a.m. and 10:00 a.m. Cornell found that the percentage for the 8-Minute Window was "not statistically significant" and the percentage for the 25 minutes before 10:00 a.m. was "statistically significant." (Cor. Nov. R. 27-28). Cornell theorizes that these results are consistent with a reaction to the public announcement by the Treasury Department prior to 10:00 a.m.

### 2. On-The-Run 30-Year Treasury Bond (the 2/15/31 Bond)

Cornell indicates that he used standard deviations to analyze the price changes in the On-The-Run 30-Year Treasury Bond (the 2/15/31 Bond). Cornell conducted calculations for the time periods of 9:35 a.m. to 9:43 a.m., 9:35 a.m. to 9:57 a.m., and 9:35 a.m. to 10:00 a.m. on October 31, 2001. Cornell looked for statistically significant results and whether the percentage price changes were distinguishable from the "random noise." (Cor. Nov. R. 29). Cornell found that the price changes were consistent with Goldman's position that the price changes were guided by the Treasury announcement rather than Goldman's trading.

### 3. Off-The-Run 30-Year Treasury Bonds

Cornell claims that he used standard deviations to assess the price changes in the Off-The-Run 30-Year Treasury Bonds traded by Goldman and for other types that were not traded by Goldman. Cornell found no statistically significant price change between 9:35 a.m. and 9:43 a.m. or between 9:35 a.m. and 9:57 a.m. Cornell did find a statistically significant price change close to 10:00 a.m. Cornell concludes that this is consistent with a market reaction to the Treasury announcement and that there was no artificial inflation by Goldman. Cornell concludes that the statistics show that there was no artificial inflation in the price of the December 2001 contracts prior to 10:00 a.m.

### 4. Individual Trader Causing Artificial Inflation

Cornell explains that the Treasury market is of such size and scope that the

prices on the market can only be affected by widespread macroeconomic forces that impact the entire economy. Cornell theorizes that since an individual trader does not have the power to meaningfully influence macroeconomic events, an individual trader cannot affect the general level of the Treasury security prices. He asserts that even large investors cannot affect the price of an individual Treasury security since the market is integrated and U.S. Treasuries are close substitutes for each other. Cornell contends that any artificial changes are further insulated by the delivery rules designed by the exchange. Cornell thus theorizes that a single investor such as Goldman, could not have artificially inflated prices.

### 5. Artificial Inflation from Trading for December 2001 Contracts

Cornell further evaluated whether Goldman's trading caused any artificial price inflation in the December 2001 Contracts and concluded that Goldman's trading did not cause such inflation. He bases his conclusion on the fact that there was only a minor change in prices between 9:35 a.m. and 9:43 a.m. He also points out that Goldman's purchases during that period were small compared to the size of the market volume for the day. Cornell also points out that the most significant price increase was close to 10:00 a.m. which is consistent with a market reaction to the Treasury announcement. Cornell concludes that Goldman's trading did not cause an artificial price inflation in the December 2001 Contracts.

### 6. Artificial Inflation from Trading for 30-Year Treasury Bonds

Cornell concludes that Goldman's trading did not cause any artificial price inflation in the 30-Year Treasury Bonds. Cornell again looks at certain time intervals to see if they were significant. He concludes that the statistics are consistent with a natural market reaction to the Treasury Department announcement at 10:00 a.m. Cornell also notes that Goldman's trading was extremely small in comparison to the available supply. In another section of his report, Cornell also notes that Goldman did not purchase any Treasury Futures Options on October 31, 2001. Cornell thus concludes that Goldman's trading in options did not or could not have manipulated the market.

### 7. Any Impact Quickly Subsumed

Cornell indicates that even if Goldman's trading had an effect on the 30-Year Treasury Bond and Treasury Bond Futures prices, any impact was quickly subsumed by the trades that occurred following the Treasury announcement. Cornell conducts statistical analyses for separate periods to support his conclusion. Cornell concludes that the "volume and price of the relevant securities on October 31, 2001 were driven by the dramatic announcement by the U.S. Treasury Department, and not Goldman's modest trading." (Cor. Nov. R. 39). Cornell further concludes that any impact by Goldman's trading would have "been eliminated immediately following the public disclosure of the Treasury announcement." (Cor. Nov. R. 39).

### 8. Reverse Repurchase and Tri-Party Repurchase Agreements

Cornell indicates that Goldman's trading in reverse repurchase agreements and tri-party repurchase agreements would not have changed the prices of the Treasury bonds and futures. Cornell provides an explanation for the types of agreements. He contends that the small amount of Treasury bonds used as collateral for such transactions could not impact prices.

### 9. December 2008 Rebuttal Report

Cornell concludes in his rebuttal report that Donaldson made several mistakes. Cornell states that Donaldson's Goldman Variable bears no relationship to whether Goldman was actually buying, selling or not trading at all. Cornell contends that the variable also fails to reflect Goldman's actual trading volume. Cornell argues that Donaldson should not have used any dummy variables because "according to generally-accepted econometric standards, dummy variables are, by definition, not as precise or reliable as actual cardinal data and should not be used unless such actual data are not available." (Cor. Dec. R. 5). Cornell contends that Goldman has provided detailed actual trading data to Donaldson and Donaldson erred in not using such data for his analyses. Cornell also contends that Donaldson's Goldman Variable fails to account for the rapid market reaction to major macroeconomic news such as the Treasury announcement on October 31, 2001. Cornell also claims that he conducted Donaldson's regression analyses using actual trading data and obtained a result that favored Goldman. Cornell also contends that Donaldson's comparison between the 30-Year Treasury Bond and other securities is unreliable and not a

generally accepted method for conducting an analysis. Cornell also points to Donaldson's further conclusions, arguing that they are speculative and unreliable.

## B. Donaldson's Rebuttal

Premium argues that Cornell's opinions should be deemed unreliable in light of Donaldson's extensive rebuttal of Cornell's opinions. Premium contends that Donaldson is a widely recognized economist and has extensive academic publications. Premium also contends that Donaldson performed the same event study using the "data and assumptions employed by" Cornell and the results were even stronger in favor of Premium. (Str. Cor. 5). Although Donaldson disagrees with Cornell's opinions, Premium has not shown Cornell to be unqualified to be an expert, and a disagreement among experts alone is not a ground to strike one or both. Donaldson's rebuttal arguments are not such that they show Cornell's opinions and analyses to be unreliable or biased as a whole.

## C. Single Trader Influence and Macroeconomic Events

Premium argues that Cornell's conclusion that no single trader can artificially inflate the Treasury market is unsupported. As indicated above, Cornell explains that the Treasury market is of such size and scope that generally the prices on the market can only be affected by widespread macroeconomic forces that impact the entire economy. Cornell theorizes that since an individual trader does not have the power to meaningfully influence macroeconomic events, an individual trader generally

cannot affect the general level of the Treasury security prices.  Premium argues that Cornell offers little more than a conclusory statement and has not adequately explained the type of analysis used to reach his conclusions.  We conclude that Cornell has provided sufficient justification for his theory.  Cornell provides support for his theory, such as a citation to the Journal of Finance, and an explanation based on his expert knowledge regarding the operation of the financial markets.  Cornell opines that "typically" even a large trader will not be able to influence the market.  (Cor. Nov. R. 31).  Premium's arguments constitute mere disagreements with the theory and are not a basis to exclude the theory in this case as unreliable or unsupported.  Therefore, we deny Premium's request to strike the portion of Cornell's November 2008 Report presenting his theory concerning the potential impact of single traders and macroeconomic events.

### D.  Cornell's Opinions Concerning Artificiality

Premium argues that Cornell's opinions concerning artificiality are not scientifically valid.

### 1.  Two-Tail Test

Premium does not agree with Cornell's usage of a two-tail test instead of the one-tail test used by Donaldson, Premium's expert, and Premium questions Cornell's characterization of certain academic sources.  As explained above, both sides have supported the use of their choice on this issue and neither side has shown the choice

used by the other side to be unreliable or a basis for the opinions to be stricken. Donaldson recognizes that the two-tail test employed by Cornell is a recognized test employed for regression analyses. Donaldson's belief that, in this case, the two-tail test is inappropriate is not sufficient to render Cornell's belief unreliable.

### 2. Square Root Rule

Premium does not agree with Cornell's usage of a square root rule when calculating the standard deviations. Premium contends that such a measure "completely fails to account for 'auto-correlation' in price movements, which renders his standard deviation of the percentage price change utterly meaningless and biased in Goldman's favor." (Str. Cor. 12). Goldman responds that a mere disagreement by Donaldson on such an issue is not a basis to strike Cornell's conclusion. Goldman also argues that Premium's "critique is flat wrong substantively- there is zero autocorrelation in an efficient market." (Ans. Str. Cor. 13). Premium has not shown that Cornell's use of the square root rule renders his opinions unreliable and inadmissible.

### 3. Pollution of Data Sample

Premium contends that Cornell "pollutes his data sample in a manner that biases the results in Goldman's favor." (Str. Cor. 12). Premium claims that Cornell failed to consider the lingering effects of the Treasury announcement on October 31, 2001, throughout the entire day and that omission makes Cornell's analyses flawed.

Premium's arguments regarding such alleged flaws in Cornell's reasoning is not sufficient to render Cornell's conclusions unreliable and inadmissible.

### 4.  Silence as to Other Time Periods

Premium argues that Cornell's price analysis is flawed since it did not consider any other time period on October 31, 2001.  Premium again argues that in this regard a one-tail test would be more appropriate and that Cornell fails to account for autocorrelation.  However, such disagreements with Cornell are not sufficient to render his opinions unreliable and inadmissible.

### 5.  Normal Price Model

Premium argues that Cornell's opinion concerning artificiality is flawed since Cornell did not make an attempt to calculate what the prices would have been in the absence of Goldman's conduct.  Premium contends that a proper way for Cornell to support his conclusions would have been to form a normal price model to compare against actual prices.  While we recognize that Premium presents alternative ways for Cornell to conduct his research, we conclude that Premium has not shown that Cornell's choice renders his opinions unreliable and inadmissible.

### 6.  Inspection of Price Movements

Premium argues that Cornell's conclusions concerning artificiality should be stricken since Cornell eyeballed price charts to form his conclusions and did not

utilize any scientific analysis.  Goldman argues that Cornell did conduct scientific analyses and notes that Cornell specifically stated that he conducted statistical t-tests and comparative metrics.  (Ans. Str. Cor. 11, 14).  Cornell also explains in Section VII of Cornell's November 2008 Report relating to an analysis of price changes prior to 10:00 a.m. on October 31, 2001, how he utilized statistical t-tests for his calculations.  (Cor. Nov. R. 26-30).  In Section IX of Cornell's November 2008 Report, Cornell  presents an "analysis showing Goldman did not, in fact, artificially inflate prices prior to Treasury Announcement on October 31, 2001."   (Cor. Nov. R. 32).  Cornell explains how he calculated trading percentages during various time periods.  Cornell concluded based on his calculations that the "*de minimis*" trading by Goldman did not cause any artificial inflation in the market.  (Cor. Nov. R. 33-34).  Cornell has sufficiently substantiated his opinion and has provided more than an ultimate conclusion.  *See, e.g., Clark v. Takata Corp.*, 192 F.3d 750, 757, 759 (7th Cir. 1999)(stating that "[a]n expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless" and that "[w]here the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact")(internal quotations omitted).  Therefore, we deny Premium's motion to strike the portions of Cornell's November 2008 Report relating to an analysis of price changes.

### 7.  Supply Reduction Artificiality Test

Premium argues that Cornell's analysis relying on a supply reduction

artificiality test should be stricken because it was not introduced in a timely fashion and it is unreliable. Premium contends that Cornell introduced the analysis for the first time in his rebuttal report and that its expert was denied the opportunity to respond to the analysis. *See First Years, Inc. v. Munchkin, Inc.*, 575 F. Supp. 2d 1002, 1009 (W.D. Wis. 2008)(noting that the "rebuttal report reache[d] far beyond the statements found in [the expert's] initial report"); *see also NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000)(indicating that in regard to the timely production of expert opinions "[t]he sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless'")(quoting in part *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)). Goldman argues that Cornell's analyses in his rebuttal report "are aimed squarely at Donaldson's analyses." (Ans. Str. Cor. 4 n.1). We find Goldman's argument to be persuasive. There is no indication that Cornell attempted to introduce the supply reduction artificiality test in Cornell's December 2008 Report in order to unfairly surprise Premium. We conclude that Cornell's analysis was clearly produced as a direct response to the report of Premium's own expert witness. Goldman has shown that the analysis at issue is sufficiently supported and reliable. Therefore, we deny Premium's motion to strike Cornell's analysis relying on a supply reduction artificiality test.

In addition, we note that Cornell would be allowed to supplement his expert report with additional information, if needed, pursuant to Federal Rule of Civil Procedure 26(e). Premium has not sought to file a supplemental expert response to

the supply reduction artificiality test analysis presented by Cornell.  A determination of the admissibility of Cornell's analysis relying on a supply reduction artificiality test is not dispositive for the ruling on Goldman's pending renewed motion for summary judgment.  If Premium believes that it needs to supplement its expert opinion on this issue, Premium is not barred from filing an appropriate and timely motion before trial, if the case goes to trial.

### E.  Cornell's Opinions Concerning Causation

Premium argues that Cornell's opinions concerning causation are not scientifically valid.

### 1.  Cause for Price Changes

Premium argues that Cornell's opinion that the Treasury announcement alone caused price changes on October 31, 2001, is unreliable and unsupported.  Premium once again disagrees with Cornell as to the appropriateness of Cornell's method used for the regression analyses.  Premium further argues that Cornell's causation theory "simply does not withstand Dr. Donaldson's detailed econometric event study, which demonstrates that Goldman's manipulative long position in futures alone significantly explains market price behavior over-and-above macroeconomic news effects and market-wide price movements and accounts for almost all the abnormal price gap."  (Str. Cor. 18).  Premium contends that Cornell's conclusions concerning causation are merely based on his "expert intuition" and should be barred as in

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir.

2005).  (Str. Cor. 17.).  In *Zenith*, the Seventh Circuit stated that "[a]n expert must

offer good reason to think that his approach produces an accurate estimate using

professional methods, and this estimate must be testable" and that "[s]omeone else

using the same data and methods must be able to replicate the result."  *Id.* at 419.

The Seventh Circuit stated that a proposed expert's reliance on "expert intuition"

rather than on methodologies recognized among scientists would not be proper.  *Id.*

In Cornell's reports, Cornell has provided details concerning the scientific methods

used to support his conclusions.  Cornell's opinions can provide circumstantial

evidence for Goldman to disprove causation.  Premium argues that the analyses

provided by Cornell are wholly deficient for the causation issue.  We conclude that

Premium has not provided sufficient justification to bar the admission of Cornell's

opinion that the Treasury announcement caused the price changes and that

Goldman's trading did not impact the price changes.  The arguments by the parties

relate to the weight to be given to Cornell's opinions, which is for the trier of fact to

decide.


### 2.  Trade-By-Trade Event Study

Premium argues that Cornell's trade-by-trade event study should be stricken,

arguing that it was not introduced in a timely fashion and that it is irrelevant.  In the

trade-by-trade study in Section III. B of Cornell's rebuttal report, Cornell explains

that he attempted to conduct a regression analysis using Donaldson's own method

with actual data instead of Donaldson's dummy variables. (Cor. Dec. R. 11). Cornell thus attempted to directly respond to the statistical analysis presented by Donaldson and Cornell was not reaching beyond the appropriate perimeters for a rebuttal report.

Premium also argues that Cornell's trade-by-trade event study is irrelevant. However, Premium's arguments are nothing more than disagreements with Cornell's analysis and conclusions. Premium argues that Cornell should have done certain things differently in his analysis, but Premium has not offered support to show that Cornell's opinions in this regard are unreliable and inadmissible. Cornell has provided sufficient support for his trade-by-trade event study to have it presented to the trier of fact and Goldman has shown that it could be relevant circumstantial evidence at trial. Thus, based on the above, we deny Premium's motion to strike Cornell's opinions regarding causation.

### F. Other Oversights by Cornell

Premium finally argues at the end of its motion to strike Cornell's reports and testimony in a catchall section that Cornell also made "numerous other important oversights. . . ." (Str. Cor. 21). Premium criticizes Cornell for: (1) failing to offer any opinions on whether options prices were artificial, (2) disregarding Goldman's reverse repurchase agreement transactions, (3) improperly focusing on Goldman's trading during the 8-Minute Window instead of the trading for the whole day on October 31, 2001, in assessing whether Goldman should be deemed a small trader,

(4) failing to account for the impact of macroeconomic news during the period leading up to October 31, 2001, and (5) characterizing Goldman as being absent from the market during the period 9:43 a.m. to 10:00 a.m. on October 31, 2001. Such arguments by Premium, however, relate to the weight that should be given to Cornell's opinions. Whether Premium would have had its expert do something different or considered different information or factors is not dispositive for assessing the admissibility of Goldman's expert testimony. Premium has not shown that Cornell's opinions are such that they could not assist the trier of fact and could not offer certain circumstantial evidence for Goldman's case. Therefore, based on the above, we deny Premium's motion to strike Cornell's reports and opinions.

## III. Goldman's Renewed Motion for Summary Judgment

Goldman argues that it is entitled to summary judgment on the remaining claim brought against it in the instant action. Pursuant to 7 U.S.C. § 13(a), it is "a felony . . . for . . . [a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce . . . ." 7 U.S.C. § 13(a)(2). A private cause of action is provided for market manipulation under 7 U.S.C. § 25(a) of the CEA. For a CEA manipulation claim, a plaintiff must establish that: "(1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1030 (N.D. Ill. 1995). Since market "manipulation defies easy description . . . manipulation cases tend to be

characterized by fact-specific, case-by-case analysis." *Id.* at 1044 (stating "Congress'

decision to prohibit manipulation without defining it apparently arose from the

concern that clever manipulators would be able to evade any legislated list of

proscribed actions or elements of such a claim"); *Frey v. Commodity Futures Trading

Com'n*, 931 F.2d 1171, 1175 (7th Cir. 1991)(stating that "[s]ophisticated economic

justification for the distinctions made in this area of the law may at times seem

questionable" and "[s]ometimes the 'know it when you see it' test may appear most

useful"). Some of the CEA manipulation cases cited by the parties in this case dealt

with allegations of manipulation through a squeeze or corner on the market. *See, e.g.,*

*Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 616 (7th Cir. 2004)(addressing

when a defendant manipulates a market through a corner or squeeze); *Frey*, 931 F.2d

at 1175 (providing elements for when the defendant is alleged to have engaged in

manipulation by putting a squeeze on the market); *Volkart Bros., Inc. v. Freeman*, 311

F.2d 52, 59 (5th Cir. 1962)(addressing manipulation through a corner or squeeze);

*United States v. Radley*, 558 F. Supp. 2d 865, 876 (N.D. Ill. 2008)(addressing

elements of cornering).


    A. Ability to Influence Prices

    Goldman argues that there is not sufficient evidence to show that it had the

ability to influence prices in the Treasury market. Goldman argues that it did not hold

a controlling position in the market and points to cases where defendants were found

to have manipulated the market when they possessed controlling and dominant

positions in the relevant market. (SJ Mem. 14). However, as Goldman itself pointed out in its motion to strike the testimony of Donaldson, the 30-Year Treasury Bond market is a unique market and such instruments during the relevant time period are not easily comparable to other Treasury instruments of different terms and price changes during other periods of time. Goldman has not shown that the circumstances in the other cases it cites are such that those cases can be readily applied to the instant action. In addition, as Premium points out, in *In re Soybean Futures Litigation*, which is also relied upon by Goldman, (SJ Mem. 13), the court stated that "[c]ontrol of the cash market is a common element in manipulation cases, yet Defendants' assertion that it is a necessary element is flawed as a matter of both law and fact" and that "control of the [commodity] was not an essential element to manipulation." 892 F. Supp. at 1025.

Goldman also cites *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971) to support its belief that a plaintiff must show that the defendant held a dominant market position for a CEA manipulation claim. (SJ Reply 17). However, as the Court in *Cargill* noted, the CEA itself has not defined the term "manipulation." 452 F.2d at 1163. The Eighth Circuit did not put forth any rigid definition of manipulation that would be applicable to every CEA manipulation claim. The Court addressed the issue before it of whether the alleged manipulator put a "squeeze" on the pertinent market by holding a dominant or controlling market position. *Id.* at 1163-64. However, the Court did not state that it was intending to put forth elements that would be applicable to all situations in which a market could be manipulated in violation of the CEA. In

fact, the Court stated that "the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished" since "[t]he methods and techniques of manipulation are limited only by the ingenuity of man." *Id.* at 1163. The Court further elaborated that the only overarching "aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Id.* Thus, the holding in *Cargill* does not, as Goldman contends, apply in this case as to the CEA manipulation claim.

Goldman also makes pleas to the court to rely on simple logic, arguing that it makes no sense that Goldman could have influenced the market. However, Premium has pointed to sufficient circumstantial evidence, particularly through its proposed expert opinions, to show that there are genuinely disputed facts concerning Goldman's ability to influence prices.

### B. Artificial Inflation of Prices

Goldman argues that there is not sufficient evidence showing that there was an artificial inflation of prices. Goldman contends that Premium has not offered "direct evidence" of artificial inflation of prices in the 30-Year Treasury Options. (SJ Mem. 17). However, Premium is not required to offer "direct" evidence at trial. Premium can offer circumstantial evidence to indirectly prove up its case and Premium has pointed to sufficient evidence and has offered sufficient explanations concerning how it may attempt to prove the necessary elements for its case. Goldman also argues that

no other court has found an artificial inflation of prices with the percentage increases present in this case. However, as Goldman acknowledges itself, the circumstances and facts in this case are unique. Goldman has not pointed to any precedent directly on point that would result in a finding by the court that Goldman's activities did not artificially inflate prices, nor has Goldman pointed to any precedent of sufficient similarity to dispose the issue at summary judgment short of trial. Premium has pointed to sufficient evidence, particularly through its proposed expert opinions, to support its theory of artificial inflation of prices by Goldman's trading activities. Goldman also argues that Cornell's opinions "demonstrate[] there was no artificial inflation in any 30-Year Treasury security." (SJ Mem. 23). However, such opinions merely point to a disagreement between the parties' experts and highlight the fact that there are genuinely disputed issues regarding artificial inflation of prices. We are not the trier of fact, and the merits of the parties' positions can only be decided by the trier of fact.

## C. Causation

Goldman argues that there is insufficient evidence to show that its trading caused any artificial inflation. Goldman has made clear that it strongly disagrees with Premium's position on causation and the opinions concerning causation presented by Premium's expert. Goldman argues that its "trading did not cause any artificial inflation." (SJ Mem. 25). However, Premium has pointed to sufficient evidence regarding causation to defeat Goldman's renewed motion for summary judgment on

that issue.  There is a genuine dispute relating to causation that needs to be resolved by the trier of fact.

### D.  Premium's Expert

Goldman argues that even if the testimony of Donaldson is admitted at trial, Premium has not shown that there is sufficient evidence to warrant denying Goldman's renewed motion for summary judgment.  Goldman cites *Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) for the proposition that "an expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment, for the judge must look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation."  *Id.* (internal quotations omitted);(SJ Mem. 30).  However, as indicated above, Premium has presented sufficient justification to show that Donaldson's opinions are more than empty facts without an adequate foundation.  Goldman also cites *American Intern. Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996) for the proposition that an "expert's opinion based on unsupported assumptions and theoretical speculations is no bar to summary judgment."  *Id.* (internal quotations omitted); (SJ Mem. 30).  In regards to Donaldson, however, as explained above, Premium has shown that Donaldson's opinions are more than unsupported theoretical speculations.  Goldman contends that Donaldson improperly used dummy variables and Goldman points out that Donaldson did not directly evaluate options prices.  Goldman also argues that Donaldson erred by failing to use actual trading data, which

Goldman contends would have produced a more reliable result.  Goldman also argues that "the Court does not need to rely on any expert opinions to evaluate the merits of Plaintiff's claims."  (SJ Mem. 31).  Goldman again asks the court to make a ruling based on the general facts in this case, stating that the arguments are "intuitive and self evident" and that the court can simply eyeball certain general facts, make its own comparisons and resolve the disputed facts in this case.  (SJ Mem. 31).  However, as indicated above, there remain in this case genuine issues of disputed material facts that need to be resolved by the trier of fact.  Therefore, we deny Goldman's renewed motion for summary judgment.


IV.  Premium's Motion to Strike the Affidavits of Boorujy and Elia

Premium moves to strike the affidavits of Beverly Boorujy (Boorujy) and Steve Elia (Elia).  Premium contends that Boorujy and Elia should not be allowed to provide a foundation concerning certain spreadsheets produced by Goldman that Goldman contends shows its trading activity at the time in question.  Premium argues that the spreadsheets do not show all of Goldman's trading activity during the time in question.  However, Premium also acknowledges that the motion to strike the affidavits of Boorujy and Elia is moot, if the court denies Goldman's motion for summary judgment without accepting the assertion in the affidavit that the spreadsheets are a complete list of all Goldman's transactions.  (Str. B and E 1).  Premium indicates that the motion is moot if the court concludes there are genuinely disputed material facts even when accepting Premium's assertions that the trading

records may not contain all trades. Having concluded above that there are genuinely disputed material facts relating to the transactions identified by Goldman and reviewed by the parties' experts, Premium's motion to strike the affidavits of Boorujy and Elia is denied as moot.

## V.  Premium's Motion to Strike the Affidavit of Joseph Yanagisawa

Premium moves to strike the affidavit of Joseph Yanagisawa, which Goldman has submitted to provide a foundation for computer records of Goldman's phone system. Premium argues that Yanagisawa lacks personal knowledge concerning the records and the affidavit lacks sufficient factual details. However, in view of the fact that we denied Goldman's motion for summary judgment, this issue is moot. The parties can raise the issue in a motion in limine if this case proceeds to trial. Therefore, we deny the motion to strike the affidavit of Joseph Yanagisawa as moot.

## CONCLUSION

Based on the foregoing analysis, we deny Goldman's renewed motion for summary judgment. We also grant in part and deny in part Goldman's motion to strike the reports and testimony of Donaldson and we deny Premium's motion to strike the reports and testimony of Cornell. Finally, we deny as moot Premium's other motions to strike.

Samuel Der-Yeghiayan
United States District Court Judge

Dated:   August 6, 2009