
CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-4010, 10-1118 & 10-1119

PREMIUM PLUS PARTNERS, L.P.,

        *Plaintiff-Appellant*,

*and*

GEORGE M. TOMLINSON, *et al.*,

        *Plaintiffs-Appellants* and
*Proposed Intervenors-Appellants*,

*v.*

GOLDMAN, SACHS & CO. and
CATHERINE C. YOUNGDAHL,
personal representative of the
Estate of John M. Youngdahl,

        *Defendants-Appellees*.

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 04 C 1851 & 09 C 1543—**Elaine E. Bucklo** &
**Samuel Der-Yeghiayan**, *Judges*.

---

ARGUED SEPTEMBER 28, 2010—DECIDED AUGUST 5, 2011

---

    Before EASTERBROOK, *Chief Judge*, and SYKES and TINDER, *Circuit Judges*.

2 Nos. 09-4010, 10-1118 & 10-1119

EASTERBROOK, *Chief Judge*. Attending a meeting at the Treasury Department on October 31, 2001, Peter J. Davis, Jr., learned that the government was suspending the sale of new 30-year bonds. The meeting ended at 9:25 AM; attendees were told that the information was embargoed until 10 AM, when the news would be announced to the public. Defying the embargo, Davis swiftly passed the information to some of his clients, including John M. Youngdahl, an economist who worked for Goldman Sachs. Youngdahl relayed the information to Goldman Sachs's traders, who at 9:35 AM began to buy futures contracts for 30-year Treasury securities, which they expected would rise in price. (There is no perfect substitute for their risk-return combination.) At 9:43 AM the Treasury posted the news on its web site, and word spread among traders. Goldman Sachs had an eight-minute head start and reaped substantial profits. It had been right: the price *did* rise, the largest one-day increase in 14 years. The Treasury did not issue 30-year bonds again until February 2006.

Abnormal trading in the minutes before the news was generally available led the SEC to open an investigation a few days later. Davis, Youngdahl, and Goldman Sachs received formal notices (known as *Wells* notices), and the investigation became public knowledge. On September 4, 2003, the agency filed a civil complaint against Davis, Youngdahl, and a third person. See SEC Litigation Release No. 18322. Goldman Sachs settled with the Commission to avoid litigation; Release 18322 describes that settlement. Goldman Sachs denied that its traders knew that the information was embargoed, but Davis and

Nos. 09-4010, 10-1118 & 10-1119 3

Youngdahl had no such defense. Youngdahl was indicted for fraud, on the theory that he misappropriated the value of information he did not have a right to use. See *United States v. O'Hagan*, 521 U.S. 642 (1997). He pleaded guilty and was sentenced to 33 months' imprisonment; Davis, who cooperated with the prosecutors, avoided indictment but was barred from the securities industry.

In March 2004 Premium Plus Partners filed a suit against Goldman Sachs and Youngdahl seeking to represent a class of all traders who held short positions in futures contracts when Goldman Sachs took the long side. Shorts lose when the price rises. Premium Plus had taken its short position before October 31, 2001. Economists would say that the reason for the price increase was the fact that a desirable asset, the 30-year Treasury bond, had become scarcer. But Premium Plus blamed the increase on Goldman Sachs's trading, which it described as giving Goldman Sachs market power through an excessively large position. As far as the record reveals, Goldman Sachs never exceeded the maximum holdings allowed by regulators and the futures exchanges. Contrast *Kohen v. Pacific Investment Management Co.*, 571 F.3d 672 (7th Cir. 2009). But the district court never reached the merits of the dispute.

Resolution of the litigation was delayed by the fact that the judge initially assigned to the case resigned, and it took a while for Judge Der-Yeghiayan, to whom the case came next, to get up to speed. Premium Plus proposed a class of all investors who held short positions on October 31, 2001, no matter when they sold or

4                           Nos. 09-4010, 10-1118 & 10-1119

closed those positions—a time that could be as long as nine months from the date of Goldman Sachs's trading. Judge Der-Yeghiayan concluded that such a class would be almost entirely unrelated to the trading that occurred during eight minutes of October 31, 2001. Any losses suffered during the next nine months by investors who had held short positions before trading began on October 31, 2001, would be the result of general market movements, not the fact that one trader got valuable news ahead of others. 2008 U.S. Dist. LEXIS 83799 (N.D. Ill. August 22, 2008).

Once the district court's decision denying the motion for class certification was released, the statute of limitations resumed running. (It had been suspended by the class allegations of the complaint. See *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560 (7th Cir. 2011).) George Tomlinson and four other investors (collectively Tomlinson), all of whom held short positions during the eight minutes, then filed their own suit, which was assigned to Judge Bucklo. She dismissed it on the pleadings, 682 F. Supp. 2d 845 (N.D. Ill. 2009), after concluding that the two-year statute of limitations, see 7 U.S.C. §25(c), had expired before Tomlinson sued—indeed, had expired before Premium Plus sued. Judge Bucklo observed that the time starts with injury, which all shorts suffered on October 31, 2001. She rejected Tomlinson's argument that investors' claims did not accrue until September 2003, when the SEC filed its complaint.

Nos. 09-4010, 10-1118 & 10-1119                                        5

Meanwhile Premium Plus tried again before Judge Der-Yeghiayan. It proposed a class limited to investors who held short positions on October 31, 2001. One problem with that class was that it would have been composed entirely of non-traders, creating a serious obstacle under the purchaser-seller rule that applies to implied private rights of action for securities and commodities fraud. See *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). Once again Judge Der-Yeghiayan declined to reach the merits. He denied Goldman Sachs's motion for summary judgment, 653 F. Supp. 2d 855 (N.D. Ill. 2009), but also denied the renewed motion to certify a class. That left Premium Plus as the only remaining plaintiff.

In response to an interrogatory, Premium Plus estimated its loss at approximately $200,000, plus interest since October 31, 2001. Goldman Sachs made an offer of judgment under Fed. R. Civ. P. 68 for the amount Premium Plus wanted, plus interest. Premium Plus accepted the offer—and it also proposed to carry on with the suit in order to have a class certified. It contends that a certified class would allow it to spread the costs of litigation to other investors. The district court was unimpressed and entered judgment on the Rule 68 offer. Tomlinson then sought to intervene in the Premium Plus suit in order to carry on as the class representative now that Premium Plus has settled its own suit. The district court denied that motion.

These decisions have led to three appeals: (1) by Premium Plus, seeking to have itself certified as representative of a class of investors who held short positions on

6　　　　　　　　　　　　　　　　Nos. 09-4010, 10-1118 & 10-1119

October 31, 2001; (2) by Tomlinson, seeking to overturn Judge Der-Yeghiayan's order denying his motion to intervene in the Premium Plus suit; and (3) by Tomlinson, contesting Judge Bucklo's order dismissing his own suit as untimely. We start with appeal #3, because it effectively resolves the second as well. Tomlinson cannot be an effective representative of the class of investors who held short positions on October 31, 2001, if he has already filed and lost his own suit; he would then not even be a member of the certified class, let alone its appropriate champion. See Fed. R. Civ. P. 23(a)(3) (representative's claim must be typical of the class's), 23(a)(4) (representative must "fairly and adequately protect the interests of the class"). See also *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550–57 (2011) (discussing the common-question requirement of Rule 23(b)(2)).

　*Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), holds that a claim for federal securities fraud accrues, and the period of limitations begins to run, when the plaintiff has discovered, or in the exercise of reasonable diligence could have discovered, the facts that constitute the violations. For this purpose, *Merck* added, the essential "facts" include the defendant's mental state—for *scienter* is an element of securities fraud. We shall assume, for the sake of argument, that *Merck* applies to statutes of limitations governing commodities fraud. (Futures contracts are governed by the Commodity Exchange Act, and thus 7 U.S.C. §25(c), rather than the Securities Exchange Act of 1934.) This assumption is favorable to Tomlinson, perhaps unduly so. The reason *Merck* asked when the "facts constituting the violation"

Nos. 09-4010, 10-1118 & 10-1119                                7

had been discovered is that 28 U.S.C. §1658(b) adopts this rule for securities-fraud suits. Section 1658(b) says that it concerns only provisions of "the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47))". Section 25(c) of the Commodity Exchange Act, by contrast, says that suit must be filed within two years of "the date the cause of action arises." We have understood this to mean the date on which the investor discovers that he has been injured. *The Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 674 (7th Cir. 2009). The language of §1658(b) that postpones accrual until the victim discovers (or using diligence could have discovered) that the defendant acted with *scienter* is hard to impute to §25(c). But if Tomlinson loses under *Merck*, he loses under any possible understanding of §25(c). That's why we have indulged this assumption.

Tomlinson concedes that he knew of his injury on October 31, 2001, and that he learned during November 2001 that Goldman Sachs had traded on the basis of material nonpublic information. The investment bank said so itself when its trading was questioned. But *scienter* was in doubt; Goldman Sachs has consistently denied that its traders understood the information came from someone under a duty of silence. If Goldman Sachs itself denied acting with a forbidden intent, Tomlinson asks, how was he supposed to know of the forbidden state of mind?

Tomlinson's argument amounts to a contention that a claim for securities or commodities fraud does not

8                      Nos. 09-4010, 10-1118 & 10-1119

accrue until the defendant has confessed or a court has adjudicated its liability. That's not the law—nor can the same result be achieved by saying that the period of limitations is tolled until the defendant confesses, or that denial of liability equitably estops the defendant to plead the statute of limitations. This circuit has rejected all of these variants. See, e.g., *In re Copper Antitrust Litigation*, 436 F.3d 782, 791 (7th Cir. 2006); *Mitchell v. Donchin*, 286 F.3d 447, 451 (7th Cir. 2002); *Chapple v. National Starch & Chemical Co.*, 178 F.3d 501, 507 (7th Cir. 1999). *Merck* does not call these decisions into question. It says that a securities-fraud claim accrues when the plaintiff discovers, or a reasonably diligent person could have discovered, the facts constituting the violation. This focuses attention on what the plaintiff knows or could have found out, not on what the defendant admits or denies—or for that matter on what a federal agency such as the SEC believes.

   There's no magic in the filing date of the Commission's complaint, which did not reveal to the public any facts previously unknown. It tells us *what* the Commission believed about defendants' mental states, but not *when* a reasonably diligent person would have reached that conclusion. It would be silly to conclude that, because the SEC did not file its complaint until September 2003, no reasonably diligent person could have inferred *scienter* earlier. Obviously the Commission's investigators drew that inference long before September 2003; it takes months (if not years) for a proposed complaint to wend its way through the agency's labyrinthine processes.

Premium Plus filed its complaint in April 2004. That tolled the time for all members of the proposed class, so the controlling question under *Merck* is whether Tomlinson, or another reasonably diligent investor, could have discovered before April 2002 that Goldman Sachs acted with *scienter*—that is, whether "it" knew that the information was confidential. We put "it" in scare quotes because corporations do not have brains and cannot know things the way natural persons do. Corporations know things when responsible employees know them. Well before April 2002 Tomlinson, and any other interested member of the investing public, could have learned that the Treasury conveyed information to Davis subject to a 10 AM embargo, so that Davis not only had a duty of confidentiality, see *Dirks v. SEC*, 463 U.S. 646 (1983), but also knew that trading before then would be unlawful; that Youngdahl (on behalf of Goldman Sachs) had hired Davis as a consultant; and that Youngdahl as a financial economist almost surely knew that the Treasury customarily made its announcements at 10 AM and therefore that a valuable piece of news relayed by Davis earlier probably was non-public even if Davis did not say this in so many words. And what Youngdahl knew, on a subject within his professional responsibilities, Goldman Sachs knew.

We can imagine a dispute about whether Youngdahl was sufficiently senior that his knowledge should be imputed to the corporation. Cf. *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375 (7th Cir. 2010) (Indiana law). But whether a particular employee's knowledge is imputed to the employer is a question of law, not of fact.

Case: 1:04-cv-01851 Document #: 615 Filed: 08/05/11 Page 10 of 13 PageID #:8940
Case: 09-4010    Document: 00711638371    Filed: 10/27/2011    Pages: 13

10                          Nos. 09-4010, 10-1118 & 10-1119

By April 2002 all of the *facts* needed to make out a claim of fraud under *O'Hagan*'s property-rights approach were in the public domain. It follows that the claim accrued before April 2002, even on the assumption that *Merck* applies to commodities-fraud claims. Judge Bucklo properly dismissed Tomlinson's suit, which also means that Judge Der-Yeghiayan did not abuse his discretion in denying Tomlinson's motion to intervene in Premium Plus Partners' suit. Having litigated and lost, Tomlinson cannot start over as the representative of other investors.

Tomlinson would be a bad representative for the class because he litigated and lost; Premium Plus Partners is a bad representative because it litigated and won. Once the district court entered judgment on the Rule 68 offer, Premium Plus's claim was extinguished. It doesn't matter whether the would-be representative has litigated and lost, or litigated and won; both situations extinguish any live claim similar to the one held by the remaining members of the class. It takes a representative with a live claim to carry on with a class action. See, e.g., *Wrightsell v. Cook County*, 599 F.3d 781 (7th Cir. 2010); *Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009).

*Deposit Guaranty National Bank v. Roper*, 445 U.S. 326 (1980), would have allowed Premium Plus to reject the Rule 68 offer and go on litigating, but it did not do that. The only thing Premium Plus could do, when its own claim became moot as a result of the settlement, was keep the case warm so that someone with a live claim could intervene. See *United States Parole Commission v. Geraghty*, 445 U.S. 388 (1980) (holding this where the district court

Nos. 09-4010, 10-1118 & 10-1119　　　　　　　　　　11

denied class certification, and the original representative filed an appeal for the sole purpose of buying time to find an intervenor); *Wiesmueller v. Kosobucki*, 513 F.3d 784, 785–86 (7th Cir. 2008) (holding this where the district court had certified a class, and the original representative appealed in order to correct an erroneous decision by the district judge that accepting a Rule 68 offer meant instant dismissal; time must be allowed for intervention). But Premium Plus does not want to keep the case going long enough for someone else to intervene; the only "someone" who stepped forward was Tomlinson. Premium Plus proposes to be the representative *itself*, even though its claim has been resolved. No decision of which we are aware allows that. (*Pastor v. State Farm Mutual Automobile Insurance Co.*, 487 F.3d 1042 (7th Cir. 2007), permits a plaintiff who has accepted a Rule 68 offer to appeal from the denial of class certification but does not hold that such a person could continue to represent the class; the court affirmed the denial of class certification and therefore did not decide whether some other representative would have to be substituted in remand.)

As Premium Plus sees things, its claim hasn't been *fully* resolved because if the class litigates, and wins, some of the expenses that Premium Plus has incurred along the way could be allocated to the class, and its net recovery therefore would be larger. The logical implication of this position is that a person whose claim is moot still can file suit seeking attorneys' fees. That position was advanced, and flopped, in *Diamond v. Charles*, 476 U.S. 54, 70–71 (1986), and again in *Lewis v. Continental*

*Bank Corp.*, 494 U.S. 472, 480 (1990); it fares no better when advanced by a would-be class representative. The Court said flatly in *Lewis* that an "interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim"; that's equally true of costs and the other expenses that Premium Plus hopes to offload to the class.

We've said that Premium Plus's own claim has been resolved, but that's not quite right. Goldman Sachs offered the sum that Premium Plus demanded as damages, plus prejudgment interest to be determined by the judge. Judge Der-Yeghiayan awarded simple interest from the date suit was filed, rather than compound interest from the date of the injury. He did not say why. The norm in federal litigation, when prejudgment interest is authorized, is compound interest from the date of the injury. See, e.g., *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir. 1992); *American National Fire Insurance Co. v. Yellow Freight System, Inc.*, 325 F.3d 924, 937–38 (7th Cir. 2003). Whether Premium Plus tarried needlessly before suing is neither here nor there. Goldman Sachs has had the money in the interim. The longer Premium Plus waited, the longer Goldman Sachs had the money, which could be invested profitably. An award of interest dating back to October 31, 2001, simply returns both the money, and the time value of its use, to Premium Plus. That the interest comes to more than 50% of the principal reflects the length of time that Goldman Sachs has had the money. This does not imply that compound interest would afford Premium Plus a windfall; the full time value of money is no windfall.

Case: 1:04-cv-01851 Document #: 615 Filed: 08/05/11 Page 13 of 13 PageID #:8943
Case: 09-4010   Document: 00711638371   Filed: 10/27/2011   Pages: 13

Nos. 09-4010, 10-1118 & 10-1119                    13

Goldman Sachs contends that Premium Plus waived appellate review of this subject by accepting the Rule 68 offer, which leaves interest to the district judge's discretion. Yet a litigant's recognition that a district judge has discretion to resolve a particular issue does not imply assent to every possible use (or misuse) of that discretion. "[A] motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F. Cas. 30, 35 (No. 14692d) (C.C. Va. 1807) (Marshall, C.J.). See also *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc). Premium Plus has not waived its entitlement to contest the district judge's exercise of discretion.

The judgments and decisions appealed from are affirmed, except with respect to the calculation of interest. That subject is returned to the district court for further proceedings consistent with this opinion.